204 N.J. Super. 149 (1985)
497 A.2d 1267
ROBSAC INDUSTRIES, INC. AND ARTISTS AND DRAFTING SUPPLIES, INC., PLAINTIFFS-APPELLANTS,
v.
CHARTPAK AND JOHN B. ZAEPFEL, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued April 2, 1985.
Decided June 27, 1985.
*150 Before Judges PRESSLER and COHEN.
John J. Petriello argued the cause for appellants (Levy & Ehrlich, attorneys).
*151 Daniel L. Rabinowitz argued the cause for respondents (McCarter & English attorneys; Rosalie Burrows, on the brief).
The opinion of the court was delivered by COHEN, J.A.D.
Plaintiffs' action for damages was dismissed on defendants' motion for summary judgment. Plaintiffs appealed, and we now reverse.
Plaintiff Robsac Industries, Inc. owns plaintiff Artists and Drafting Supplies, Inc. They are both in the stationery and office supplies business, Robsac in California and Artists and Drafting in New Jersey. Defendant Chartpak is a manufacturer of stationery and office supplies for which Artists and Drafting was a dealer/distributor. Defendant John Zaepfel is Chartpak's president.
In January 1982, the United States government, through the General Services Administration, solicited offers to sell GSA graphic arts supplies. Robsac and Chartpak both submitted bids. The previous year's contract had been awarded to Chartpak. In earlier years, Robsac had been the successful bidder, supplying GSA with Chartpak products.
For the 1982 contract, Robsac was low bidder, followed by Chartpak. Before GSA would finally award the contract, Robsac was required to submit evidence of an uninterrupted source of supply, which could be a letter of commitment from the manufacturer. It is undisputed that on April 7, 1982 John Dunphy, Chartpak's marketing services manager, orally assured GSA that Artists and Drafting Supplies was an authorized Chartpak dealer/distributor. On April 9, however, defendant Zaepfel wrote a contrary letter to S.H. Murphy, Contracting Officer at GSA, which generated this lawsuit. The letter said:

*152 Dear Mr. Murphy:
We received a call from Mr. Ferrito, representing the General Services Administration, requesting that Artist & Drafting Supplies of Newark, New Jersey be qualified as a supplier on the 1982 GSA contract for graphic art supplies. I wish to respond to that request by stating that Chartpak cannot grant this authorization pending the outcome of the investigation by the Commanding General of Travis Air Force Base regarding alleged contract infractions by Artist & Drafting Supplies. We also have not heard any response from your office regarding the verbal allegations by current government accounts that Artist & Drafting Supplies was misrepresenting the current GSA contract. As you know, we have documented complaints from Bergstrom Air Force Base in Austin, Texas; CINCLANT Compound in Norfolk, Virginia; and the Ohio National Guard in Mansfield, Ohio.
Furthermore, we have had complaints from our dealers that Artist & Drafting Supplies has falsely represented the goods of other manufacturers as Chartpak product.
Due to these alleged improprieties, it is not in the best interest of the government, nor Chartpak, to grant this authorization.
Please advise if you have any questions.
Sincerely,
Since Robsac counted on fulfilling the contract with Chartpak products obtained through Artists and Drafting, it was unable to satisfy GSA that it could perform the contract. Robsac was therefore disqualified, and Chartpak was awarded the contract. This litigation followed. Chartpak wrote to Artists and Drafting on November 15, 1982, notifying it that it would no longer be a dealer/distributor as of December 31, 1982.
After issues arose as to the sufficiency of their complaint, plaintiffs filed an amended complaint on December 27, 1983. It contained seven counts seeking compensatory and punitive damages, all focused on the April 9 letter Chartpak sent to GSA. The first count charged Chartpak with malicious interference with plaintiffs' contract rights, economic benefits and advantages. The second count charged Chartpak with fraudulent misrepresentations; the third with defamation.[1] The fourth, fifth and sixth counts charged that defendant Zaepfel personally committed or directed the corporate torts and was *153 therefore individually liable. There was a seventh count for breach of an agreement to take back salable inventory.
Defendants filed their motion for summary judgment on February 16, 1984, 51 days after plaintiffs filed the amended complaint. Defendants asserted that the court lacked personal jurisdiction over defendant Zaepfel and that defendants were entitled, in any event, to judgment in their favor as a matter of law. Plaintiffs cross-moved to compel defendants to comply with a December 23 request for production of documents. The court granted defendants' motion for summary judgment in a brief order that makes it impossible to tell if it included a ruling on the personal jurisdiction issue. The court's oral opinion is also unclear on the subject. The opinion forecasts a denial of plaintiffs' cross-motion for production of documents, but no order was entered as far as the record shows.
In support of their motion for summary judgment, defendants submitted four affidavits. One was from Patrick O. McSwain, Airman First Class and supplies buyer for the Air Force at Bergstrom Air Force Base, Texas. His duties included placing orders against contracts awarded by GSA. In May or June 1981, Hal Arden of Robsac told McSwain that Robsac was authorized to accept orders under Chartpak's then current contract, GS-025-32701. McSwain said he contacted John Dunphy of Chartpak, who said that Robsac was not so authorized. Plaintiffs' response to this affidavit was a certification of Hal Arden. He said that Robsac was an authorized Chartpak distributor under contract GS-025-32290, which expired April 30, 1981, and that he did not recall telling McSwain that Robsac was an authorized Chartpak distributor under contract GS-025-32701. Plaintiffs also submitted a certification of Robert Sachs, president of both corporations, that he was unaware of any complaints at Bergstrom Air Force Base.
The second affidavit was from James Kirkland, president of a competitor distributor of products of Chartpak, Zipatone, Inc. and others. In early 1980, he said, he spoke to Ben Beal, *154 president of Zipatone. Thereafter "and as a result of that conversation," Kirkland told Chartpak that Robsac was substituting Zipatone for some Chartpak products while Robsac held a government contract. In response to this statement, plaintiffs furnished the certification of Robert Sachs. In it he said that, as far as he knew, there had been no complaints of substitutions for Chartpak products. After summary judgment was entered and this appeal taken, plaintiffs unsuccessfully moved to supplement the record with an unsworn statement of Ben Beal contradicting Kirkland's affidavit.
The third affidavit was from Scott R. Liard. He was a special agent with the Air Force Office of Special Investigations, stationed at Hanscom Air Force Base, Massachusetts. On January 29, 1982, he met "with several Chartpak officials ... as part of an ongoing AFOSI investigation concerning alleged contract irregularities. The subject of this investigation was Artist[s] and Drafting...." Plaintiffs did not directly respond to this statement.
The fourth affidavit was from John J. Dunphy, Chartpak's marketing services manager. He said that before April 9, 1982 he had complaints "from several government accounts" stating that, during Chartpak's 1981 GSA contract, Robsac told them it could ship and bill Chartpak products under the contract and that he was given such information by Airman McSwain, Sergeant Berry of the Ohio National Guard and David Weaver, DM-2, CINCLANT, Norfolk, Virginia. In response, Robert Sachs certified that he and the corporations were unaware of any of the complaints described by Dunphy.
There was also an affidavit of Stanley Murphy, GSA Chief of Procurement, Unit II, Office Supplies Commodity Operations Branch, New York. He made it clear that GSA declined to contract with Robsac because it was unsatisfied Robsac would have an uninterrupted supply of Chartpak products "in view of *155 Chartpak's notification to this office that [plaintiffs] are no longer authorized dealers of Chartpak's products."
Against this picture, the trial court concluded that there were no material facts in dispute and that defendants were entitled to judgment as a matter of law. R. 4:46-2. We disagree. The April 9 Zaepfel letter raises more questions than the supporting affidavits lay to rest. What plaintiffs unsuccessfully sought from Chartpak was a manufacturer's commitment to assure GSA that Robsac could obtain the goods it proposed to sell. Chartpak refused to commit, it said in the April 9 letter, because of (1) an investigation by the Commanding General of Travis Air Force Base of unspecified contract violations about which no information was supplied to the court and of which Robert Sachs said he was unaware; (2) "verbal allegations by current government accounts," particularly from Bergstrom AFB, Norfolk, Va., and Mansfield, Ohio, which, the Arden certification implied, concerned altered relations between Chartpak and plaintiffs, which did not involve prejudice to the government and which plaintiffs said they never heard of, and (3) "complaints from our dealers" of false representations of others' products as Chartpak's. The only example in the affidavit was the Zipatone incident, about which plaintiffs said they were unaware and which was the subject of their unsuccessful motion to supplement the record.
One can not say on this record whether there was an investigation at Travis Air Force Base, or what it was about or whether Chartpak generated or orchestrated it and other complaints or inquiries for the purpose of disposing of a troublesome competitor. The trial court laid heavy stress on plaintiffs' failure to deny defendants' factual allegations. It is unclear how plaintiffs were expected to deny the existence of complaints of which they say they were unaware except by saying they were unaware of them. It is unclear how they could be criticized for failure to make a factual attack on the allegations contained in the April 9 letter and the affidavits submitted on *156 the motion after having been stonewalled in discovery for the seven or eight weeks between the filing of their amended complaint and defendants' filing of their motion. It must be remembered that defendants' letter did not allege wrongdoing on plaintiffs' part. It only alleged that there were complaints and investigations, and the affidavits did not fully support the letter.
It is impossible to tell as a matter of law whether the means defendants employed against their dealer-competitor were fair or foul, whether the allegations made in the April 9 letter against plaintiffs were true or false, defamatory, qualifiedly privileged or malicious, or whether the letter was fraudulent in substantial part. The facts were all in the possession of defendants, making it unreasonable to expect plaintiffs to controvert them without discovery. R. 4:46-5(a). Thus, the first three counts, which implicated Chartpak, should not have been dismissed.
The fourth, fifth and sixth counts stand on the same footing. They charge Chartpak's president with personal responsibility for Chartpak's torts. Corporate officers are liable to persons injured by their own torts, even though they were acting on behalf of the corporation and their intent was to benefit the corporation, Cappiello v. Ragen Precision Indus., Inc., 192 N.J. Super. 523, 530 (App.Div. 1984), even though liability also attaches to the corporation, Trustees Structural Steel v. Huber, 136 N.J. Super. 501, 505 (App.Div. 1975) certif. den. 70 N.J. 143 (1976); Sensale v. Applikon Dyeing & Printing Corp., 12 N.J. Super. 171 (App.Div. 1951), and even though they derive no personal benefit. Hirsch v. Phily, 4 N.J. 408, 416 (1950); McGlynn v. Schultz, 95 N.J. Super. 412, 416 (App.Div. 1967), certif. den. 50 N.J. 409 (1967). See generally 3A Fletcher, Cyc. Corp. (Perm.Ed. 1975), §§ 1135, 1143. Thus, the fourth, fifth and sixth counts should not have been dismissed.
*157 The seventh count arose out of the termination of Artists and Drafting as a Chartpak dealer and Chartpak's offer to take back and pay for salable inventory. Chartpak's position is that it was a gratuitous offer that never worked out. Plaintiffs, however, submitted certifications that the offer was accepted and that they detrimentally relied by withholding sales to others. In these circumstances, summary judgment should not have been granted.
There is the unresolved matter of personal jurisdiction over the individual defendant. Since the court disposed of the case on other grounds, it is unclear whether it ruled at all on this subject. If it did, it did so without articulating reasons for its decision. All in all, we think it best that the court consider the matter anew on remand. In doing so, it might consider ordering new briefs from the parties who, in our view, did not deal fully in the trial court or here with the difficult issues raised by various approaches of United States v. Montreal Trust Company, 358 F.2d 239 (2 Cir.), cert. den. 384 U.S. 919, 86 S.Ct. 1366, 16 L.Ed.2d 440 (1966); Columbia Briargate Co. v. First Nat. Bank, 713 F.2d 1052 (4 Cir.1983) cert. den 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984) and cases cited therein; Chancellor v. Lawrence, 501 F. Supp. 997 (N.D.Ill. 1980); Donner v. Tams-Witmark Music Library, Inc., 480 F. Supp. 1229 (E.D.Pa. 1979), and Stop-A-Flat Corp. v. Electra Start of Michigan, 507 F. Supp. 647 (E.D.Pa. 1981).
Finally, the trial court should permit plaintiffs to renew their undecided motion for production of documents. Since its denial of the motion appears to have been founded on its grant of defendants' motion for summary judgment, plaintiffs' motion should be considered anew.
The summary judgment is reversed, and the matter is remanded for further proceedings consistent herewith. We do not retain jurisdiction.
NOTES
[1] The complaint did not charge violation of the Franchise Practices Act. N.J.S.A. 56:10-1 et seq.