**EDUCATIONAL TESTING SERVICE, Plaintiff,**

v.

**John KATZMAN, et al., Defendants.**

**Civ. A. No. 85–3768.**

United States District Court,
D. New Jersey,
Civil Division.

April 2, 1986.

See also, D.C., 626 F.Supp. 527.

McCarter & English, P.C., Newark, N.J. by John L. McGoldrick, John F. Brenner, Wilmer, Cutler & Pickering, P.C., Washington, D.C. by John Rounsaville, Jr., Carol F. Lee, Thomas P. Olson (Stanford von Mayrhauser, Russell W. Martin, Educational Testing Service, Princeton, N.J., of counsel), for plaintiff.

Greenberg, Dauber & Epstein, P.C., Newark, N.J. by Edward J. Dauber, Linda G. Harvey, Gordon, Hurwitz, Butowsky, Weitzen, Shalov & Wein, P.C., New York City by Allan R. Freedman, Madonna Malin, for defendants Princeton Review and John Katzman.

## OPINION

BARRY, District Judge.

Educational Testing Service ("ETS") brings this action against The Princeton Review ("Review") and its sole officer and shareholder, John Katzman ("Katzman"), alleging copyright infringement and pendent state claims. Katzman, but not Review, now moves for dismissal claiming that this court may not assert personal jurisdiction over him. He claims, as well, that venue is improper. Katzman's motions will be denied.

I

ETS, a non-profit New York corporation with its principal place of business in New Jersey, has developed and administers the Scholastic Aptitude Test ("SAT") and the College Board Achievement Tests ("Achievement Tests") taken by almost two million high school students in their quest for admission to the college of their choice. The SAT and the Achievement Tests are copyrighted by ETS and, pursuant to 37

C.F.R. § 202.20, are secured tests which are only viewed by the public during the administration of those tests to registered examinees.

In light of the intense competition to enter certain colleges and in recognition of the importance of SAT and Achievement Test scores in the admission process, it is not surprising that a number of SAT "coaching" courses, including the course offered by Review, have developed. Review, founded in 1981[1] and operated as a sole proprietorship until its incorporation on March 7, 1984, quickly expanded from 15 students in New York to what was reported to be five thousand students nationwide in 1985. Review currently operates courses in Princeton, New Jersey; San Jose, California; Brookfield, Connecticut; Brookline, Massachusetts; Beverly Hills, California; Atlanta, Georgia; Philadelphia, Pennsylvania; Anaheim, California; Alexandria, Virginia; and Evanston, Illinois.[2] It advertises that it raises students' SAT scores an average of 150 points.[3]

This action is not the first legal controversy between these parties. In November, 1982, ETS administered certain Math and English Composition Achievement Tests. It later discovered that, before the test date, the tests had been distributed by Katzman, although how Katzman obtained the tests is not clear. As a result, however, ETS was forced to cancel the scores of certain students and readminister the tests. ETS also discovered that, in order to become more familiar with ETS' tests, Katzman registered for and took several of those tests, including the January, 1983 SAT.

---

1. Recent advertisements placed by Review proudly state "It all started in New Jersey. In early 1977, a few young Ivy League grads offered a 50 hour, ten-session program ..." Presumably, this statement refers to earlier courses Katzman, as a Princeton University freshman, taught as part of other coaching programs.

2. The Princeton Review Management Corporation was incorporated in Delaware in May, 1985 to serve as the parent organization of a fran-

chise utilizing Review's name and method. The first franchises were offered in November, 1985 but as of December 13, 1985, there were no signed franchise agreements.

3. The SAT is graded on a 200–800 point scale. A 150 point increase in a student's score could obviously have a significant impact on that student's chance of admission to a particular college.

In 1983, Katzman, in his individual capacity and as a result of the 1982 incident, entered into a consent agreement with ETS and acknowledged receiving, copying, and distributing to students he was coaching copies of certain Mathematics and English Composition Achievement Tests and agreed to cease and desist from these and similar actions. Katzman further agreed not to register for or attend any ETS administered test unless the test was required to support an application to an educational institution or to obtain a license or credential. Further, neither Katzman nor his agents were to take any ETS test in order to "reconstruct or recall test questions for use in tutoring or test preparation courses."

On February 9, 1984, Katzman and one Robert Schiller copyrighted certain coaching materials including twenty questions which ETS claims were copies of or paraphrased from secure ETS questions. Schiller is the President of Pre-Test Review, Inc. ("Pre-Test"), a New Jersey corporation that offers coaching courses in New Jersey. Pre-Test distributed these materials, including the allegedly infringing questions, to its students in New Jersey in June, 1985. Review, it is claimed, distributed these same materials to its students in Brookline, Massachusetts.[4]

ETS learned of the distribution of these materials in the Spring of 1985 and avers that, as a result of that distribution, it was forced to provide substitute test forms at the last minute to avoid cancelling the June, 1985 examination at certain test centers. ETS also alleges that various Review employees have taken ETS administered tests since the 1983 agreement. More significantly, as it relates to this motion, ETS alleges, and Katzman admits, that on January 26, 1985, Katzman attempted to take the SAT as a standby candidate at Dwight-Englewood School in Englewood, New Jersey.

ETS' amended complaint alleges that Review and Katzman have infringed upon its copyright in certain SAT and Achievement tests by reproducing and distributing them to Review students. Further, ETS claims that Review and Katzman are in breach of the 1983 agreement between Katzman and ETS. Finally, ETS alleges that Review and Katzman have unjustifiably and improperly interfered with ETS' common law right to preserve the integrity of its testing program and the confidentiality of its secure tests. ETS seeks a permanent injunction prohibiting defendants from further copyright infringement and ordering them to comply with the terms of the 1983 agreement.[5] Finally, ETS seeks statutory damages pursuant to the Copyright Act of 1976, 17 U.S.C. § 504(c), which permits damages of up to $50,000 for willful infringement of a copyrighted work.

## II

Pursuant to Fed.R.Civ.P. 4, this court has jurisdiction over Katzman only if a New Jersey state court would have jurisdiction.[6] New Jersey courts exercise jurisdiction over a non-resident defendant to the extent permitted under the due process clause. N.J.Civ.Prac. R. 4:4–4. ETS bears the burden of establishing that Katzman has contacts with New Jersey sufficient to satisfy this standard. *Compagnie des Bauxites de Guinee v. L'Union Atlantique S.A. D'Assurances,* 723 F.2d 357, 362 (3d Cir.1983).

---

4. Pursuant to a consent order entered into during the course of the instant case between Schiller and ETS, Schiller and Pre-Test were dismissed as defendants with Schiller representing that he received the allegedly infringing questions from Review with the understanding that none of them infringed on ETS' copyright.

5. A preliminary injunction was entered on August 16, 1985, 626 F.Supp. 527.

6. While this case arises under this court's copyright jurisdiction, service of process must be made subject to the New Jersey long-arm statute, and personal jurisdiction is determined in accordance with Fourteenth Amendment standards. *See DeJames v. Magnificence Carriers, Inc.,* 654 F.2d 280, 283, 284 (3d Cir.), *cert. denied,* 454 U.S. 1085, 102 S.Ct. 642, 70 L.Ed.2d 620 (1981).

ETS argues in support of a finding of jurisdiction that, prior to the incorporation of Review in March, 1984, Katzman:

1) made two phone calls from New York to ETS in New Jersey relating to test administrations in the New York City area and the scores of individual Review students. (Contact 1)

2) wrote one letter from New York to ETS at its New Jersey address relating to test administrations in the New York city area and the scores of individual Review students. (Contact 2)

3) visited ETS' offices in New Jersey on November 10, 1982, to resolve issues related to the 1982 Achievement test incident. (Contact 3)

4) provided copies of secure test questions for distribution in New Jersey to Pre-Test in or before February, 1984. (Contact 4)

5) ordered 7,600 copies of various ETS tests from ETS' New Jersey headquarters. (Contact 5)

ETS further alleges that, since the incorporation of Review in March, 1984, Katzman:

1) attempted to take the SAT at Dwight-Englewood School in Englewood, New Jersey on January 26, 1986, in violation of the 1983 Agreement. (Contact 6)

2) personally helped to establish a New Jersey branch of Review subsequent to the filing of this action. (Contact 7)

3) telephoned ETS five times regarding test administrations in the New York City area and the scores of individual Review students. (Contact 8)

4) wrote four letters to ETS regarding test administrations in New York and the test scores of individual Review students. (Contact 9)

5) placed two orders for ETS materials.[7] (Contact 10)

6) in his alter ego of Review, solicited employees through advertisements in at least eight New Jersey newspapers in July, 1985 and posted a notice in the Princeton University Placement Office. (Contact 11)

7) in his alter ego of Review, advertised in February and August, 1985 in The New York Times, which has a weekday circulation of 130,000 copies in New Jersey.[8] (Contact 12)

ETS argues that this court should consider Katzman's contacts with New Jersey in his corporate capacity on two grounds. First, ETS argues that New Jersey law does not limit the reach of its courts for the purpose of asserting jurisdiction over corporate officers. Second, it argues that Katzman's total control of Review as its founder and sole owner, officer, director, and shareholder justify viewing Review and Katzman as the same for jurisdictional purposes. ETS contends that these twelve contacts taken together establish sufficient minimum contacts between Katzman and New Jersey so as to satisfy the due process concerns of fair play and substantial justice.[9]

---

**7.** ETS' records also show that Review placed numerous orders but most of these, including those from the New York office, do not appear to have been placed by Katzman.

**8.** ETS has also alleged various other contacts between Katzman and ETS but upon review the court finds that these allegations do not withstand minimal scrutiny. For instance, ETS avers that Review sent messengers into New Jersey to pick up the thousands of copies of ETS' publications it had ordered. However, the factual record provided to support this allegation merely shows that Pre-Test sent messengers. While there might be some connection between Pre-Test and Review, ETS has not provided the court with any documentation that would allow

it to consider Pre-Test and Review as the same for purposes of jurisdiction.

**9.** ETS has not alleged that Katzman was subject to general jurisdiction based on a continuous and systematic presence within New Jersey. Katzman was a student at Princeton University in New Jersey from 1977 to 1981 but since 1981 has had only these twelve contacts with New Jersey. While the Supreme Court has had numerous occasions to amplify the limits of the minimum contacts test, its only discussions of general jurisdiction are found in *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) and *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952).

Alternatively, ETS argues that under *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), Katzman is subject to jurisdiction under an "effects test" because of what ETS characterizes as intentional conduct that Katzman knew would injure ETS in New Jersey. Jurisdiction is proper, ETS avers, because the brunt of the harm caused by Katzman was suffered in New Jersey.

The Court of Appeals for the Third Circuit has developed a two step analysis for determining whether jurisdiction may be asserted over a non-resident defendant:

> The initial determination that must be made is whether the claim or cause of action which is being pursued arises from the defendant's forum related activities [citation omitted].... If the claim pursued arises from forum related activity, the court must determine whether there are enough contacts with the forum arising out of *that* transaction in order to justify the assertion of jurisdiction over the out-of-state defendant.... If the claim pursued arises from non-forum related activity, the plaintiff must demonstrate that in other respects the defendant has maintained 'continuous and substantial' forum affiliations [citations omitted]. *Reliance Steel Products Co. v. Watson, Ess, Marshall & Enggas,* 675 F.2d 587, 588 (3d Cir.1982). (emphasis in original)

Based on these cases, it is clear that these twelve contacts do not establish that Katzman had systematic contacts with New Jersey.

The result of the general/specific distinction in this case, as developed below, is that only two of these twelve contacts are relevant to the question of jurisdiction because the remaining ten contacts do not relate to ETS' cause of action. The cumulative effect of the twelve contacts should, however, be relevant to a jurisdictional inquiry even if there is no general jurisdiction. In *Burger King Corp. v. Rudzewicz,* ―― U.S. ――, ――, 105 S.Ct. 2174, 2185, 85 L.Ed.2d 528 (1985), the Court noted that it "long ago rejected the notion that personal jurisdiction might turn on 'mechanical' tests [citation omitted], or on conceptualistic ... theories of the place of contracting or of performance [citation omitted]." The fact that so much of this opinion is by necessity focused on conceptual concerns suggests that this general/specific distinction may

Subsequently, in *Dollar Savings Bank v. First Security Bank of Utah,* 746 F.2d 208, 211 (3d Cir.1984), the Third Circuit utilized a similar test but stated that " 'general jurisdiction' exists when the claim does not arise out of *or is unrelated* to the defendants' contacts with the forum [citations omitted]." *Id.* (emphasis added). Similarly, " 'specific jurisdiction' is invoked when the claim is *related to* or arises out of the defendant's contacts with the forum." *Id.* (emphasis added). The impetus for this modification apparently was *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 nn. 8 & 9, 104 S.Ct. 1868, 1872 nn. 8 & 9, 80 L.Ed.2d 404 (1984), in which the Supreme Court observed that

> when a State exercises personal jurisdiction over a defendant in a *suit arising out of or related* to the defendant's contacts with the forum, the State is exercising 'specific jurisdiction' over the defendant.... When a state exercises personal jurisdiction over a defendant in a suit *not arising out of or related to* the defendant's contacts with the forum, the State has been said to be exercising 'general jurisdiction' over the defendant [citations omitted]. (emphasis added).

### III

In light of this precedent, binding on me, I must examine whether ETS' claims arose

not be as helpful or appropriate as normally assumed. At the very least, the facts of this case suggest that there may well be a third category of cases in which, while jurisdiction is not found under either of those categories, the alleged contacts create a sufficient nexus to satisfy due process concerns. For instance, while I find that the two contacts which may be considered satisfy due process concerns, even if they did not do so, all twelve contacts taken together establish the requisite connection between Katzman and New Jersey to satisfy the constitutional concerns of fair play and substantial justice. These contacts, while neither continuous and systematic nor relating to plaintiff's cause of action, create more than isolated instances of contact and provide enough of a nexus between the defendant and the forum state such that it would be fair to require the defendant to defend in New Jersey.

out of or are related to Katzman's forum related conduct. Prior to that examination, however, three questions must be resolved. First, which of ETS' claims should be considered. Second, is a defendant's forum related conduct subsequent to the filing of a complaint relevant for purposes of jurisdiction. Third, may a defendant's contacts with the forum state made in his corporate capacity be considered in an inquiry as to whether jurisdiction exists over the defendant.

The first question is easily resolved. It is well settled that a court must assert jurisdiction over a party as relates to a particular claim. This case is before this court because it involves a question of copyright with the contract and common law claims before me only by virtue of pendent jurisdiction. If, for some hypothetical reason, the copyright claim were to be dismissed at this juncture, I would dismiss the pendent claims unless there was diversity jurisdiction. But for purposes of diversity, the parties are all citizens of New York. Therefore, for Katzman to be amenable to suit in New Jersey, I must find that the court has jurisdiction over him on the copyright claim.

 With reference to the second question, Katzman argues that "the relevant time frame for assessing whether a defendant's contacts with the state confer jurisdiction is the time when the suit was brought, not conduct thereafter." Katzman's Brief at 4. In support of this argument Katzman cites two cases, the first of which is *Sunbury Wire Rope Manufacturing Co. v. United States Steel Corp.*, 230 F.2d 511 (3d Cir.1956). In *Sunbury*, the defendant New Jersey corporation had been registered and doing business in Pennsylvania but had duly cancelled its registration and discontinued its Pennsylvania contacts prior to the filing of the suit. The defendant moved to dismiss the complaint on the ground of improper venue and that motion was granted. The Third Circuit reversed, stating in dictum that the defendant, having consented to being sued in Pennsylvania, could not revoke that con-

sent concerning causes of action which arose during the defendant's presence in the state. This court fails to understand how *Sunbury* supports a conclusion that Katzman's post-complaint contacts with New Jersey are not relevant to the question of personal jurisdiction. I note in passing that even if Katzman can construct a favorable argument based on this dictum, its soundness was recently questioned by the Honorable Clarkson S. Fisher in *Datascope Corp. v. Smec Inc.*, 561 F.Supp. 787, 790 (D.N.J.1983), who found it "contrary to the majority view today."

The second case relied upon by Katzman, *Schaffer v. Granit Hotel, Inc.*, 110 N.J.Super. 1, 6, 264 A.2d 240, 243 (App.Div.1970), is on point. In *Schaffer*, a case in which personal jurisdiction was at issue, the court found that

> the mere fact that a part of defendant's activities—advertising in *The Jewish News*—occurred subsequent to the date of plaintiff's injuries, [did] not invalidate the service made upon defendant. Such activity occurred prior to the institution of suit and it therefore may be considered in determining whether sufficient 'minimum contacts' have been made [citations omitted]. *Id.* at 6–7, 264 A.2d at 243.

At first glance this language suggests that the filing of suit is some watershed mark after which the defendant's activities should not be considered. Indeed, this very suggestion was made in *Radigan v. Innisbrook Resort and Golf Club*, 142 N.J. Super. 419, 424, 425, 361 A.2d 610, 613, 614 (Law Div.1976), *modified on other grounds*, 150 N.J.Super. 427, 375 A.2d 1229 (App.Div.1977). As in *Schaffer*, the defendant in *Radigan* argued that the acts on which jurisdiction was predicated occurred after the cause of action accrued. Again, as in *Schaffer*, the *Radigan* court found that the acts occurred "prior to the institution of suit; they thus satisfy the demands of due process." 142 N.J.Super. at 425, 361 A.2d at 614. This court has discovered no other case in New Jersey or in the federal courts discussing this issue.

In both *Schaffer* and *Radigan,* the issue before the court was not whether contacts with the forum state after the filing of the complaint should or could be considered in determining the defendant's amenability to suit. Rather, the issue in both cases was the attempt to enlarge the time frame within which the defendant's contacts with the forum state would be relevant. The language of *Radigan* is telling: because the contacts occurred prior to the filing of the complaint, consideration of them would not "offend traditional notions of fair play." *Id.* The court implied that the proper standard for determining whether certain contacts should be considered is the familiar standard found in *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), namely, whether consideration of those contacts will offend traditional notions of fair play and substantial justice.

The due process limitations on a court's personal jurisdiction over non-resident defendants is meant to ensure that individuals have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign [thus giving] a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit [citations omitted]." *Burger King Corp. v. Rudzewicz,* —— U.S. ——, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985). Once a defendant has been served with a complaint, he is on notice that he may be subject to jurisdiction in that forum. At that time, perhaps more than at any other, the defendant who wishes to contest jurisdiction, frequently on the advice of lawyers, begins ordering his affairs to show that he has no contacts with the forum state.

To use the date of the filing of a complaint in most cases seems appropriate so that a defendant may not avoid liability by removing himself from the jurisdiction. However, that moment in time should not be graven in stone particularly where, as here, the defendant has subsequent to the filing of a complaint established a continuous and systematic presence in the forum state. To permit the filing of a complaint to limit jurisdiction by immunizing a defendant's future actions in the forum state when those actions are a mere continuation of those underlying the complaint would make no sense. Moreover, I fail to see any due process interest which would be served by such immunity. Therefore, all contacts between Katzman and New Jersey subsequent to the filing of the complaint, but which are not the result of his defense of this case, are relevant to determining whether Katzman is subject to this court's jurisdiction. Accordingly, contact 7, i.e. Katzman's assistance in establishing a New Jersey branch of Review, will be considered but, for other reasons, will be rejected.

■ Finally, before determining whether ETS' cause of action arises out of or is related to Katzman's forum contacts, I must determine if actions taken by Katzman in his corporate capacity may be imputed to Katzman as an individual. This is a somewhat confusing area of law in which there is no precedent binding on me.

The most useful starting point is the Third Circuit's opinion in *Donsco, Inc. v. Casper Corp.,* 587 F.2d 602 (3d Cir.1978). In *Donsco,* plaintiffs sued the Casper Corporation, Casper Pinsker individually, and Casper Pinsker doing business as Casper Imports alleging unfair competition and false advertising in connection with reproductions of a unique mechanical penny bank. The district court found the Casper Corporation liable but held that Casper Pinsker was not personally liable. "A corporate officer is individually liable for the torts he personally commits and cannot shield himself behind a corporation when he is an actual participant in the tort [citations omitted]." *Id.* at 606. Continuing, the Court of Appeals noted that this

liability is distinct from the liability resulting from the 'piercing of the corporate veil' as that term is commonly used. The effect of piercing a corporate veil is to hold the owner liable. The rationale

for piercing the corporate veil is that the corporation is something less than a bona fide independent entity. *Pinsker is liable here as an actor rather than as an owner....* The only crucial predicate to Pinsker's liability is his participation in the wrongful acts. *Id.* (emphasis added). While liability and not personal jurisdiction was contested in *Donsco,* the separation of Pinsker's liability as an owner and as an actor is significant.

In *Donner v. Tams-Witmark Music, Library, Inc.,* 480 F.Supp. 1229 (E.D.Pa. 1979), the question of personal jurisdiction over a corporate officer acting in his corporate capacity was squarely addressed. Plaintiffs, in that copyright case, claimed that the defendant corporation infringed their rights under a copyright license agreement when it authorized another performance by another party of the music covered in a license agreement. The record established that the president of the defendant corporation, one Aborn, knew of the infringement. Judge Becker, now of the Third Circuit, noted that "as a rule the courts have declined to exercise personal jurisdiction over individuals for their acts done in a corporate capacity." *Id.* at 1233. However, he also noted that "[t]he crucial issue is whether we may infer from acts which are sufficient to create personal liability, if proved, to contacts which are sufficient to confer personal jurisdiction over the individual defendant." *Id.* at 1234. Finding direct support for such an inference from case law in the Third Circuit, the court concluded that:

> It would be anomalous, and would defeat the purposes of the law creating substantive liability, to permit a corporate officer to shield himself from jurisdiction by means of the corporate entity, when he could not interpose the same shield as a defense against substantive liability. Therefore, we hold that *Aborn's allegedly tortious conduct in his capacity as president ... may be considered to determine whether the court has jurisdiction over Aborn as an individual defendant. Id.* (emphasis added).

Less than two months after the decision in *Donner,* another district court within the Third Circuit reached the opposite result. In *Testa v. Janssen,* 482 F.Supp. 1195 (W.D.Pa.1980), plaintiffs claimed that the defendants infringed their copyrighted song by producing and publishing a substantially similar song. The defendant corporation was wholly owned by defendant Wes Farrell. The court noted that, under Pennsylvania law, "the transaction of business solely as an officer or agent of a corporation does not establish jurisdiction over the individual (citations omitted).... Since plaintiffs do not contend that [the defendant corporation] is a sham corporation or that Farrell was acting as the alter ego of the corporation ... Farrell's motion to dismiss must be granted [citations omitted]." *Id.* at 1199. *Testa,* however, has only been cited by one district court within the Third Circuit, and then not for this principle.

The question of personal jurisdiction over a corporate officer was next considered in *PSC Professional Services Group, Inc. v. American Digital Systems, Inc.,* 555 F.Supp. 788 (E.D.Pa.1983). In *PSC,* plaintiffs claimed that they were the victims of wrongful use of civil process, unfair competition, and trade libel. The individual defendants, Ralph and Peter Petroff, were shareholders, officers and directors of the corporate defendant and were charged with having personally taken part in the tortious conduct alleged. The court found that the defendants had committed no tortious acts in Pennsylvania in either their individual or corporate capacities. Plaintiffs argued, however, that jurisdiction existed over the defendants by virtue of tortious acts committed by them as agents of a corporation subject to jurisdiction in Pennsylvania because Pennsylvania's substantive law provided that corporate agents are personally liable for the torts they commit in their corporate capacities. Again, the court rejected the suggestion that the Petroffs had actually committed any acts in Pennsylvania in their official capacities.

PSC's argument for subjecting the Petroffs to personal jurisdiction rested primarily on *Donner*. Chief Judge Luongo explained, however, that:

> It is essential to understand that *Donner* does not hold that Pennsylvania may assert jurisdiction over corporate officers simply by virtue of their participation in tortious activity on behalf of a corporation which itself is subject to jurisdiction in this state. Indeed, if that were so, officers of corporations that do business in Pennsylvania would be subject to suit here based upon torts, committed in their corporate capacities, which bear absolutely no relationship to the forum. . . . In my view, *Donner stands for the proposition that all of a non-resident defendant's contacts with the forum, in whatever capacity, will be weighed in determining whether those contacts are, from a due process standpoint, sufficient to exercise jurisdiction over him for claims arising from those contacts.* In other words, minimum contacts analysis does not discount a defendant's contacts with the forum simply because that defendant was acting at the time as agent for another. *Id.* at 791–92 (emphasis added).[10]

The *PSC* court concluded that while in accordance with *Donsco* the Petroffs might be liable for the torts alleged, the question was whether they should be subject to suit in Pennsylvania. In concluding that they could not be sued in Pennsylvania, the court noted that:

> Were the law otherwise, officers of corporations operating in several states would be faced with a Hobson's choice. They must either disassociate themselves from the corporation or defend the propriety of their conduct in a distant forum. *Id.* at 793.

*PSC* was a relatively easy case because the individual defendants, even in their corporate capacities, had no actual contact with the State of Pennsylvania. In *Simpson v. Lifespring, Inc.*, 572 F.Supp. 1251 (E.D.Pa.1983), the president and principal shareholder of the defendant corporation was joined in the complaint. He had connections with the forum state in his corporate capacity but those contacts were "not for the perpetration of his allegedly tortious conduct." *Id.* at 1253. Therefore, the court found that the president was not personally subject to suit in Pennsylvania.

The most recent case decided by a district court within the Third Circuit is *Simkins Corporation v. Gourmet Resources Int'l*, 601 F.Supp. 1336, 1346 (E.D.Pa.1985), which, under facts similar to *PSC*, followed that court's approach and held that because the plaintiff had failed to allege any forum contact by the defendants in their individual capacities, they would not be subject to personal jurisdiction.

All of these cases were based upon Pennsylvania substantive law. While this issue has not received as much attention by district courts applying New Jersey law or by the state courts of New Jersey, *Trustees of Structural Steel v. Huber*, 136 N.J.Super. 501, 347 A.2d 10 (App.Div.1975), *certif. denied*, 70 N.J. 143, 358 A.2d 190 (1976), is directly on point. Plaintiffs, trustees of union funds, sued the president and principal shareholder of Palisades System, Inc., a New York corporation. Palisades had initially been sued by plaintiffs for allegedly violating certain collective bargaining agreements and, in this suit, plaintiffs alleged that Huber had intentionally prolonged settlement negotiations by representing through counsel that any recovery by Palisades in a third law suit against third parties would be applied to satisfy the monies allegedly owed plaintiffs. By the time the negotiations collapsed and plaintiffs obtained a judgment against Palisades, Palisades was merely a shell corporation because Huber had converted Palisades' assets into his own account. The trial court granted Huber's motion to

10. In a footnote to this paragraph the court noted that "[i]t is well-settled that, absent allegations that the corporate shield is a sham, jurisdiction over the corporation does not subject officers, directors and shareholders of the corporation to personal jurisdiction [citations omitted]." *Id.* at 791 n. 5.

quash service of process finding that the court did not have long-arm jurisdiction over him.

On appeal, the Appellate Division noted that

> while a director or officer of a corporation does not incur personal liability for its torts merely by reason of his official character, if he directs the tortious act to be done, or participates or cooperates therein, he is personally liable to third persons injured or damaged thereby, even though liability may also attach to the corporation [citations omitted]. *Id.* at 505, 347 A.2d at 12.

The court further observed that the issue in a motion to quash process was not whether the plaintiff had a meritorious case but whether New Jersey was the proper place to determine the merits of the case. In finding jurisdiction, the court accepted defendant's contention that "his only business contact with New Jersey was as president of Palisades in the signing of that [collective bargaining] agreement and in subsequently responding to telephone calls for payment" but found that "there is a direct connection between the collective bargaining agreement, the signing of which brought defendant into this State, and his subsequent alleged tortious conduct which gave rise to the asserted causes of action. This", the Appellate Division concluded, "was sufficient to justify jurisdiction." *Id.* at 506, 347 A.2d at 13.

While New Jersey does not appear to have definitively accepted the *Huber* approach, *see Robsac Industries, Inc. v. Chartpak,* 204 N.J.Super. 149, 497 A.2d 1267 (App.Div.1985) (suggesting that, on remand, trial court consider ordering new briefs on issue of corporate officer's amenability to jurisdiction in light of different approaches taken by various courts), *Huber* does make clear that New Jersey law assumes, as does Pennsylvania law, that corporate officers are liable for torts committed in their corporate capacities and that, also as in Pennsylvania, the issues of liability and jurisdiction should be analyzed separately.

While the Supreme Court of the United States has not directly considered this question, in *Calder v. Jones, supra,* 465 U.S. at 790, 104 S.Ct. at 1487–88, the Court noted that the individual defendants' contacts with the forum should not be judged according to their employer's activities there. The individual defendants in *Calder* were not corporate officers or directors but merely employees. As such, however, they were not "somehow insulated from jurisdiction." *Id. Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 781 n. 13, 104 S.Ct. 1473, 1482 n. 13, 79 L.Ed.2d 790 (1984), explains that:

> jurisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him; nor does jurisdiction over a parent corporation automatically establish jurisdiction over a wholly owned subsidiary [citations omitted]. Each defendant's contacts with the forum State must be assessed individually [citation omitted].

After a careful examination of these cases, particularly in light of the recent pronouncements on personal jurisdiction of the Supreme Court, I find that the emerging doctrine in this area appears to be that actions taken *within the forum state* by a corporate official in his official capacity may be considered for purposes of establishing jurisdiction over him in his individual capacity. However, actions taken by an individual in his corporate capacity outside the forum state are not necessarily enough to establish jurisdiction over the individual. Accordingly, I will consider all of Katzman's contacts with New Jersey both prior to and after the incorporation of Review. I will not, however, impute to Katzman the actions of Review taken in New Jersey unless ETS has established that the specific action within New Jersey was taken by Katzman himself. Thus, I will not consider contacts 7, 11 or 12 as ETS has failed to establish that these actions were taken by Katzman, much less taken by him in this state.

## IV

■ Having established the relevant claims and time frame and the contacts which I should properly consider in this motion, I turn to the inquiry under *Dollar Savings Bank:* is ETS' claim related to or arising out of Katzman's contacts with New Jersey? [11]

Notwithstanding the clear directive of the Third Circuit that this is the proper starting point in a discussion of personal jurisdiction, few cases in this circuit discuss what it means to "arise out of" or to be "related to" a defendant's contacts with the forum. In one, *Rutherford v. Sherburne,* 616 F.Supp. 1456 (D.N.J.1985), the New Jersey plaintiff was injured while skiing at the defendant's ski area in Vermont. Jurisdiction over the defendant was asserted on the basis of the advertising defendant periodically placed in New Jersey. In determining whether it was necessary to establish general jurisdiction or whether specific jurisdiction would be sufficient, the Hon. Mitchell H. Cohen noted that the Supreme Court in *Helicopteros Nacionales de Colombia, S.A. v. Hall, supra,* 466 U.S. at 415 n. 10, 104 S.Ct. at 1873 n. 10, specifically refrained from reaching questions as to

> whether the terms 'arising out of' and 'related to' describe different connections between a cause of action and a defendant's contact with the forum, and ... what sort of tie between the cause of action and a defendant's contacts with a forum is necessary to a determination that either connection exists. Nor do we reach the question whether, if the two types of relationship differ, a forum's exercise of personal jurisdiction in a situation where the cause of action 'relates to' but does not 'arise out of' the defendant's contacts with the forum should be

analyzed as an assertion of specific jurisdiction.

*Rutherford v. Sherburne, supra,* 616 F.Supp. at 1459–60.

Whether general or specific jurisdiction is required will often predetermine the result of a defendant's motion to dismiss for lack of personal jurisdiction. Judge Cohen held that it is "clear that a claim may be 'related to' a defendant's contact with a forum while not 'arising out of' the same." 616 F.Supp. at 1460. For instance, under the *Rutherford* facts, the only type of claim which could "arise out of" an advertisement would be defamation or invasion of privacy. But, observing that plaintiff had traveled to defendant's ski area in Vermont *because* of the advertisement, Judge Cohen found "it is difficult to imagine how her injury would *not* be *related to* the defendant's solicitations." *Id.* at 1460, 1461.

How I define the terms "arising out of" and "related to" will be dispositive of this motion. As noted above, for purposes of this motion I will only consider the copyright claim. Strictly speaking, only those activities which infringe on a copyright owner's exclusive rights as defined in 17 U.S.C. § 501 give rise to ETS' copyright action. Section 501 incorporates by reference all of the exclusive rights of a copyright owner as codified at 17 U.S.C. §§ 106–118 and 17 U.S.C. § 602. Briefly stated, these rights encompass the rights of the copyright owner to reproduce his work, prepare derivative works, publicly perform and display his work, as well as the right to control the importation into the United States of materials copyrighted in his name. In reviewing the list of Katzman's contacts with New Jersey, none of those contacts could have infringed any of

**11.** Unlike most cases requiring a minimum contacts analysis, the instant parties are not diverse. As noted above, this lack of diversity limits the scope of the jurisdictional analysis to those contacts arising out of or relating to the copyright claim. For instance, if the parties were diverse, this would be a relatively simple case because I could properly consider contacts 1, 2, 3, 4, 8, 9, 10, 11, and 12 which, while not relating to the

copyright claim, clearly relate to the pendent state claims of breach of contract and violation of ETS' common law rights to maintain the confidentiality of its secure tests. Thus, due to the unique posture of this case, I am forced to entertain the very mechanical and conceptualistic analysis discouraged by the Supreme Court. *See supra* note 9.

these rights. Indeed, with reference to those acts which are alleged to have infringed on ETS' copyright, the complaint is either silent as to where they occurred or indicates that they in fact occurred outside of New Jersey.

Nevertheless, I agree with Judge Cohen that the "related to" language of *Dollar Savings Bank* encompasses more than the "arising out of" standard used in *Reliance Steel.* Application of this standard to the facts at bar is relatively simple. The 1983 agreement between ETS and Katzman made clear that its purpose was to resolve the *copyright* dispute between the parties. Therefore, Katzman's attendance at the November 10, 1982 meeting (contact 3) held at ETS' offices in New Jersey, which meeting was part of the negotiation leading to the 1983 agreement, is relevant to a ruling on Katzman's amenability to suit in New Jersey. Further, since Katzman has admitted to taking the SAT numerous times for the purpose of familiarizing himself with its contents, *see* 1983 agreement, his attempt to take the January 1985 SAT (contact 6) relates to the 1983 agreement, and, therefore, also relates to the copyright claim. Thus, I may also consider that contact in this discussion.[12]

In performing a minimum contacts analysis the court must avoid the temptation to proceed mathematically but must make a careful analysis geared to the particular case. *See Kulko v. California Superior Court,* 436 U.S. 84, 92, 98 S.Ct. 1690, 1696–97, 56 L.Ed.2d 132 (1978); *Strick Corp. v. A.J.F. Warehouse Distributors, Inc.,* 532 F.Supp. 951, 957 (E.D.Pa.1982). In *Burger King, supra,* the Supreme Court's most recent discussion of minimum contacts, Justice Brennan noted for the Court that:

the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the fo-

rum State. [citations omitted] Although it has been argued that foreseeability of causing *injury* in another State should be sufficient to establish such contacts there when policy considerations so require, the Court has consistently held that this kind of foreseeability is not a 'sufficient benchmark' for exercising personal jurisdiction. [citation omitted] Instead, 'the foreseeability that is critical to due process analysis ... is that, the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there [citation omitted].' —— U.S. at ——, 105 S.Ct. at 2183.

In defining when a defendant should reasonably anticipate being haled into a foreign court, Justice Brennan cited *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958):

it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. —— U.S. at ——, 105 S.Ct. at 2183.

In applying this standard, I find that Katzman is amenable to suit in New Jersey. In 1982, Katzman entered this State to resolve a copyright dispute with ETS. At that meeting, Katzman admitted to having committed acts which would clearly provide the basis for a *prima facie* case of copyright infringement and agreed to stop such activities. At this juncture Katzman was clearly on notice that his actions were the concern of ETS' New Jersey headquarters. Nevertheless, Katzman chose a New Jersey testing site in January, 1985 to attempt to take the SAT. While Katzman argues that he did not intend to take the SAT but only to determine if ETS was abiding by its uniform rules regarding test-

---

**12.** Contacts 1, 2, 5, 8, 9 and 10, inasmuch as they relate only to the daily functioning of Review and are not alleged to be infringing acts in and of themselves, may not be considered in this determination because ETS' cause of action neither arose from nor relates to those contacts. Contact 4, which relates to the distribution by Katzman to Pre-Test of copies of 20 allegedly secure questions, may not be considered in a discussion of Katzman's minimum contacts with New Jersey because ETS has failed to establish that the transfer took place in New Jersey, but is discussed below as it relates to the effects test.

ing procedures, in light of his admissions that he had often taken the SAT to familiarize himself with ETS' test questions, he certainly could have foreseen that he might be called into court to explain these actions which were in violation of the consent agreement. Having freely chosen to attempt to take the test in New Jersey, Katzman cannot now convincingly argue that he has not availed himself of the "privilege of conducting activities in the forum State." *Id.* As stated in *Burger King:*

> So long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction. *McGee v. International Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957). The Court has noted, however, that 'some single or occasional acts' related to the forum may not be sufficient to establish jurisdiction if 'their nature and quality and the circumstances of their commission' create only an 'attenuated' affiliation with the forum. *International Shoe Co. v. Washington,* 326 U.S. 310, 318, 66 S.Ct. 154, 159, 90 L.Ed. 95 (1945) [other citation omitted]. This distinction derives from the belief that, with respect to this category of 'isolated' acts, [citation omitted] the reasonable foreseeability of litigation in the forum is substantially diminished. —— U.S. at ——, 105 S.Ct. at 2184 n. 18.

Contacts 3 and 6 were not attenuated but, as discussed above, were "related to" the copyright claim and created a "substantial connection" with New Jersey. Therefore, I find that this court has jurisdiction over Katzman.

## V

ETS also asserts that Katzman is amenable to suit in New Jersey under the "effects test" endorsed by the Supreme Court in *Calder v. Jones, supra.* While I find that Katzman has sufficient contacts with New Jersey under a minimum contacts analysis, this court would not have jurisdiction were it required to rely on the effects test.

In *Calder,* the plaintiff brought a libel suit in California against the National Enquirer and two Florida based employees who were the editor and the reporter of an allegedly defamatory article. Noting that the National Enquirer sold more copies in California than in any other state and that the plaintiff lived there, the Court concluded:

> The article was drawn from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California. In sum, California is the focal point both of the story and of the harm suffered. Jurisdiction over petitioners is therefore proper in California based on the 'effects' of their Florida conduct in California. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297–98 [100 S.Ct. 559, 567–68, 62 L.Ed.2d 490 (1980)]; Restatement (Second) of Conflicts of Law § 37. *Calder, supra,* 465 U.S. at 788–89, 104 S.Ct. at 1487.

The citation to *World-Wide Volkswagen* is instructive:

> The forum state does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State [citation omitted]. 444 U.S. at 297–98, 100 S.Ct. at 567.

Of course, in *World-Wide Volkswagen* the Court concluded that an automobile retailer and its wholesale distributor were not subject to jurisdiction in Oklahoma merely because they sold an automobile to the plaintiff in New York and plaintiff was subsequently involved in an accident in Oklahoma. The Court thus rejected the notion that in every case the seller's "amenability to suit would travel with the chattel." *Id.* at 296, 100 S.Ct. at 566. The facts of *World-Wide Volkswagen* appear to define the outer limits of the "stream of commerce" theory.

*Calder* and *World-Wide Volkswagen* are helpful in defining the limits of a court's jurisdiction under the due process clause. But *Calder*, while approving the use of the effects test, did so in language closely tied to the facts of that particular libel case. It is still an open question whether, after *Calder*, due process concerns will permit the use of the effects test in every tort action. It is also an open question whether the "effect" may be merely related to the plaintiff's cause of action or be the contact from which the plaintiff's cause of action arose.

New Jersey, like California, extends jurisdiction to the limits allowed by the due process clause. Moreover, the Appellate Division of New Jersey, like the appellate court in California, has endorsed the effects test.

In *Blessing v. Prosser*, 141 N.J.Super. 548, 359 A.2d 493 (App.Div.1976), defendant, a New York hotel, advertised and received laudatory reviews in national travel books published by the American Automobile Association. In a brief opinion, the Appellate Division found that there was jurisdiction over the defendant because "the advertising was by its very nature intended to and did in fact cause 'effects' in this State." *Id.* at 550, 359 A.2d 493.[13]

The *Blessing* court premised its decision on the same Restatement (Second) of Conflicts of Law § 37 cited in *World-Wide Volkswagen*. That section states:

A state has power to exercise judicial jurisdiction over an individual who causes effects in the state by an act done elsewhere with respect to any cause of action arising from these effects unless the nature of the effects and of the individual's relationship to the state make the exercise of such jurisdiction unreasonable.[14]

Section 50 applies the same rule to foreign corporations.

In addition to causing the in-state effect, there must be some basis for finding that the defendant could reasonably have foreseen that his action would cause effects in the forum state. *See e.g., World-Wide Volkswagen, supra,* 444 U.S. at 297, 100 S.Ct. at 567, ("if the sale of a product [in the forum state] ... arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States"); *Blessing, supra,* 141 N.J.Super. at 550, 359 A.2d at 494 (advertising intended to cause effects in forum state); Restatement, *supra,* comment to § 37 at 157–58.

When applied to a copyright case, the effects test creates particular problems. Where, for example, does the injury occur?[15] If it occurs, as ETS argues, wher-

---

**13.** A year later in *Moon Carrier v. Reliance Ins. Co.,* 153 N.J.Super. 312, 379 A.2d 517 (Law Div. 1977), the same conclusion was reached. In *Moon Carrier,* the New York Telephone Company claimed it was not subject to jurisdiction in New Jersey when its only contact with the state was to provide the plaintiff with a foreign exchange service. The Company argued that it had not purposefully availed itself of the benefit of doing business in New Jersey because it was compelled by federal regulation to provide interstate phone service. In finding jurisdiction, the trial court emphasized that it is sufficient that an out of state defendant know that his action will have substantial effects "in the forum state." *Id.* at 327, 379 A.2d at 524. It does not appear that any other New Jersey case has applied the effects test in a tort setting.

**14.** On its face, the effects test would not appear to abolish the minimum contacts requirement necessary in a specific jurisdiction question.

However, *Calder, supra,* 465 U.S. at 787 n. 6, 104 S.Ct. at 1486 n. 6, appears to do just that.

**15.** At oral argument, counsel for ETS conceded that he was not certain where the cause of action arose, *see* Tr. at 25–27, and did not argue to the court that every infringement claim brought by ETS could be heard in New Jersey. While *Horne v. Adolph Coors Co.,* 684 F.2d 255, 259–60 (3d Cir.1982), appears to suggest that in all intangible property cases the cause of action arises in the property owner's home state, there is case law to the contrary. For instance, in trademark infringement cases the wrong takes place where the passing off to consumers occurs. *Battle Creek Equip. Co. v. Roberts Mfg. Co.,* 460 F.Supp. 18, 20 (W.D.Mich.1978) *citing Vanity Fair Mills, Inc. v. T. Eaton Co.,* 234 F.2d 633, 639 (2d Cir.), *cert. denied,* 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956). This accords well with the general purpose of trademark law,

ever the copyright owner resides, it would follow that a copyright owner may always sue in his home state so long as he alleges intentional acts on the part of the defendant. Indeed, one Third Circuit case, *Horne v. Adolph Coors Co.*, 684 F.2d 255 (3d Cir.1982), seems to endorse that result. In *Horne*, the plaintiff held a patent for a device depressurizing beverage cans. The district court dismissed the complaint against the Colorado defendant because it did not do business in New Jersey even though there was some "bootlegging" of its product in the state and it had registered its name in New Jersey to prevent its use by competitors. The Third Circuit reversed, finding that Coors had constructive notice of the patent and knew "it would cause injury to the owner, thereof, in whatever state he resided." *Id.* at 260. The court reasoned that patent laws are the creation of federal law and that Congress could, therefore, without offending federalism concerns, "provide that the owner of federally protected intellectual property could always sue an infringer in his home state." The only limit on this power is the due process concern of fairness. But because both patents and trade secrets would be deemed to have fictional situs at the residence of their owners, the cause of action arose in the plaintiff's home state. Therefore, jurisdiction could be asserted under the effects test. *Id.* at 259, 260.

However, more recently in *Max Daetwyler Corp. v. Meyer*, 762 F.2d 290 (3d Cir. 1985), Judge Garth writing for the majority specifically questioned the *Horne* holding noting that "the proposition that tortious injury may occur wherever the infringing products are sold [is] ... such a far rang-

ing theory [that] if carried to its logical extreme, [it] might well result in the very 'national contacts' theory which we have unanimously rejected....." *Id.* at 299 n. 12. Further, in accordance with the Restatement, Judge Garth observed that

> even the fact that patent infringement may be deemed a tort cannot relieve a plaintiff from establishing that a defendant has sufficient minimum contacts with the forum state. Nor can the designation of patent infringement as a tort automatically satisfy the forseeability requirement of *World-Wide Volkswagen, Id.*

The *Max Daetwyler* approach has yet to be accepted. Having sat by designation on the *Daetwyler* panel, my concurrence with Judge Garth's opinion is a matter of record. However, I need not reach these issues today in order to apply the effects test to the case at bar.

It is undisputed that, with Pre-Test, Katzman copyrighted materials containing twenty questions which allegedly infringe on ETS' copyright. Further, Katzman provided those questions to Pre-Test, a New Jersey corporation. Under these facts, it can well be argued that Katzman acted purposefully to effect the use of these questions in New Jersey. Nevertheless, this court does not have jurisdiction under the effects test because ETS' cause of action against Katzman did not arise from this action.

ETS' amended complaint limits its cause of action to the infringing acts of Katzman and Review; there is no allegation of infringement by Pre-Test.[16] Therefore, while

---

namely the prevention of confusion to the public which is caused when one party palms off his goods as those of another. *See Miller Brewing Co. v. Carling O'Keefe Breweries,* 452 F.Supp. 429, 445 (W.D.N.Y.1978) and cases cited therein.

While copyright law is premised on the same constitutional grant as patent law, U.S. Const. Art. I, sec. 8, clause 8, most commentators do not believe that the two areas of law should be subject to the same standards and analysis. *See* A. Latman, The Copyright Law 16, 17 (1979) and *Alfred Bell & Co. v. Catalda Fine Arts, Inc.,* 191 F.2d 99 (2d Cir.1951). Generally, copyright law

attempts to encourage both creative pursuit and public knowledge. Patent law is more concerned with protecting the property rights of the patent owner. Therefore, I do not find it appropriate to apply *Horne's* broad holding to this copyright case.

**16.** ETS could have pled that Katzman was either vicariously liable or contributorily negligent. *See Sony Corp. of America v. Universal City Studios,* 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984); *Gershwin Publishing Corp. v. Columbia Artists Management,* 443 F.2d 1159 (2d Cir.1971). For a general discussion of these

the acts of Pre-Test relate to the amended complaint, ETS' cause of action as pleaded in the amended complaint did not *arise* from those facts. While the Supreme Court's language in *Calder* appears to have been carefully crafted to avoid reaching this issue, the effects test if not limited will abolish any meaningful limit on a court's jurisdiction. Therefore, I conclude that the effects test is not a proper basis for asserting jurisdiction over Katzman because the one effect attributable to Katzman, while related, was not the effect from which the cause of action arose.

### VI

■ Katzman has also moved for dismissal alleging that venue is improper. He argues that, under the relevant statutes, venue and jurisdiction are not identical and argues that the venue statute should be construed to limit those districts in which he is subject to jurisdiction. While there is some support for this argument in the commentaries, *see, e.g.,* A. Latman, The Copyright Law 226–229 (1979), it is established law in this circuit that venue is proper in a copyright case wherever the court may properly assert jurisdiction over the defendant. *Testa, supra,* 482 F.Supp. at 1197; *Donner, supra,* 480 F.Supp. at 1234, 1235.

The court will enter an order denying Katzman's motions.

concepts after the *Sony* decision *see* Note, *Parallel Importing Under the Copyright Act of 1976,* N.Y.U.J. Int'l L. & Pol. 113, 140–45 (1984). The effects test, had ETS so pleaded, would have been a proper jurisdictional basis because that particular effect would have given rise to plaintiff's cause of action.