REGENCY OLDSMOBILE, INC., a New Jersey Corporation, Plaintiff,

v.

GENERAL MOTORS CORPORATION, Moore-Hudson Oldsmobile GMC, Inc., Lyons Motors, Inc., Childress Buick, John Does 4–50 and John Does 51–100, Defendants,

and

GENERAL MOTORS CORPORATION, Defendant/Counterclaimant,

v.

REGENCY OLDSMOBILE, INC., Defendant on Counterclaim,

and

Kenneth Hagen and David West, Additional Defendants on Counterclaim.

Civ. A. No. 87–314 (AMW).

United States District Court, D. New Jersey.

May 2, 1988.

Mark C. Perlberg, Margolis, Chase, Kosicki, Aboyoun & Hartman, P.A., Verona, N.J., for plaintiff, Regency Oldsmobile, Inc. and defendants on the counterclaim, Kenneth Hagen and David West.

Michael S. Waters, Carpenter, Bennett & Morrissey, Newark, N.J., for defendant General Motors Corp.

Frederic S. Kessler, Clapp & Eisenberg, Newark, N.J., for defendants Moore–Hudson Oldsmobile GMC, Inc., Lyons Motors, Inc. and Childress Buick.

## OPINION

WOLIN, District Judge.

The defendants, Moore–Hudson Oldsmobile GMC, Inc. ("Moore–Hudson"), Lyons Motors, Inc. ("Lyons") and Childress Buick ("Childress"), renew their application to dismiss the amended complaint as it pertains to them on the grounds that the court lacks *in personam* jurisdiction and that the District of New Jersey is the improper venue.[1] For the reasons set forth herein the motion as to lack of personal jurisdiction is granted as to all defendants, thereby mooting the issue of improper venue.

## I. BACKGROUND

Regency Oldsmobile, Inc. ("Regency") was an automobile dealership located in Lakewood, New Jersey. In 1985, with the tacit approval of General Motors Corporation ("GM"), Regency became involved in the nationwide marketing of GM's Protection Plan (the "Plan"), a service contract in the nature of an extended warranty for newly purchased GM vehicles. Difficulties arose between Regency and GM, and Regency ultimately ceased its nationwide sales program and in fact sold the assets of its agency in April, 1987. Regency thereafter instituted this action against GM. In the amended complaint Regency asserted violations of federal antitrust statutes, as well as violations of state law against GM and certain designated dealer defendants.[2]

It is undisputed that during Regency's sales program the dealer defendants wrote to GM objecting to sales of the Plan in each of the dealers' geographic areas. It is further undisputed that none of these dealers transact business, solicit or advertise in New Jersey. Each maintain a principal place of business in a foreign state. By virtue of dealer letter-complaints,[3] Regency submits that personal jurisdiction is proper in the District of New Jersey.

With this factual overview in mind, an examination of the leading authorities clearly demonstrates that personal jurisdiction over these defendants in the District of New Jersey is unwarranted.

## II. THE DEFENDANTS

There is no question that all dealers who wrote letters to GM (collectively, the "defendants") were deeply concerned about extra-geographical competition and the embarrassment factor associated with a discount offer by another dealer when their customer had paid the full suggested Plan price. Some of them had ceased selling other types of warranty plans in acceding to the profit lure GM forecasted in its 1985 model year advance literature and subsequently continued in GM's Administrative Guide. Understandably, they contacted GM for an explanation. Albeit some dealers phrased their inquiry more strongly than others, none of them suggested that GM take any action against Regency in New Jersey. Their primary concern was the elimination of the reduced price dealing within their respective geographical areas.

*Moore–Hudson Oldsmobile GMC, Inc.*

Moore–Hudson was incorporated in South Carolina. It had no business contact with the State of New Jersey. On February 10, 1986, James E. Hudson, President, wrote a letter to Pat Hayes, Zone Manager of the Oldsmobile Division, confirming a prior telephone conversation and outlining

---

1. The Honorable H. Lee Sarokin initially denied the motion without prejudice, but invited the parties to renew it prior to trial if, at the close of discovery, Regency was unable to provide the factual support for its allegation that defendants knowingly caused injury to plaintiff in New Jersey.

2. Counts 10, 11 and 12 allege that these dealer defendants combined and conspired with GM in restraint of trade. Counts 14, 15 and 16 specify an interference with Regency's expectation of economic advantage and business relationships.

3. Those letters are attached to the respective interrogatory answers of each dealer-defendant.

problems associated with the sale of the Plan by out-of-state dealerships. In the letter, Hudson solicited GM's assistance in restricting sale of the Plan to those dealers within the marketing area of the customer. He closed by noting that if GM was unable to restrict sales by April 1, 1986, he would have no other alternative but to begin writing General Warranty Policies. Answers to interrogatories indicated that no response to the letter was received and that this defendant had no contact with any other entity pertaining to Regency's business or with Regency itself.

### Lyons Motors, Inc.

Lyons was incorporated and authorized to conduct business only in the State of Montana. It had no business relationships with any entity conducting business in the State of New Jersey. Lyons addressed two letters to representatives of GM relating to concerns it had regarding interference with its business relationships with its customers. It had no oral communication with GM. The first letter, dated August 17, 1985, may be fairly characterized as an angry letter of inquiry. The second letter, dated February 26, 1986, commented on customer relations as a result of Regency's sales program and suggested that GM make inquiry of other dealers as to whether their customers were also "harassed by this 'Regency Oldsmobile.'" The second letter concluded that if GM wanted Lyons to sell the Plan, GM should "curb 'this other dealer' from calling on our customers and let us do our job."[4] At no time did GM respond to either of these letters. Lyons also had no direct contact with Regency.

### Childress

Childress is an Arizona corporation authorized to do business in that state. It, too, had no business relationships with any other entities conducting business in the State of New Jersey. Many of its customers who had purchased the Plan subse-

quently received solicitations from Regency and notified Childress of these solicitations. Based upon their customers' concern, Childress wrote a letter of inquiry to GM Protection Plan Supervision. This letter expressed concern that GM was leaking its customers' names to "this dealership in New Jersey or Pennsylvania." It closed with a request that GM protect their customers' names from falling into the hands of their competitors.[5] As a result of a GM reply, Childress learned that Regency was purchasing lists of customers' names from R.L. Polk Registration Lists. Childress sent another letter to A.J. Thomas, GM Protection Plan Manager, which restated its concerns and voiced an opinion as to how GM should resolve the problem of extra-geographical Plan solicitation.[6]

### III. DISCUSSION

Any discussion pertaining to personal jurisdiction commences with an understanding that the Due Process Clause rejects forum amenability without meaningful contacts, ties or relations to the forum state. *International Shoe Co. v. Washington*, 326 U.S. 310, 319, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945). Individuals are entitled to "fair warning" that a particular activity may subject them to a foreign sovereign's jurisdiction. *Shaffer v. Heitner*, 433 U.S. 186, 218, 97 S.Ct. 2569, 2587, 53 L.Ed.2d 683 (1977). However, this "fair warning" requirement is satisfied when a defendant "purposefully directs" his activities to residents of a foreign forum, *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984), and the ensuing litigation results from alleged injuries that "arise out of or relate to" those activities. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984). Under such circumstances a forum may assert specific jurisdiction over an out-

---

**4.** The letter dated February 26, 1986 though drafted by the same author as the earlier letter, is addressed to a different GM representative.

**5.** The letter was forwarded to GM Protection Plan on March 21, 1985.

**6.** A following letter was sent on January 17, 1986. It recognized the free enterprise aspect of Regency's nationwide solicitation but suggested that GM cease giving bonuses for this type of solicitation.

of-state defendant who has not consented to suit there. *See Keeton,* 465 U.S. at 774, 104 S.Ct. at 1478 (persons engaged in distribution of magazines may be held accountable in a foreign forum for damages resulting there from an allegedly defamatory story); *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 97 L.Ed.2d 804 (1984) (persons engaged in the editorial preparation of magazines held accountable in a foreign forum for damages resulting there from an allegedly defamatory story). This policy evolves from a state's "manifest interest" in providing its residents with a convenient forum for redressing injuries inflicted by a non-resident actor. *McGee v. International Life Insurance Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957).

■ In *Burger King Corporation v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), Justice Brennan, after a systematic and expansive review of existing authorities, concluded that "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum state." 471 U.S. at 474, 105 S.Ct. at 2182 (*citing International Shoe Co. v. Washington, supra,* 326 U.S. at 316, 66 S.Ct. at 158). After rejecting the theory of foreseeability of causing injury in another state as a "sufficient benchmark" for exercising personal jurisdiction, Justice Brennan cited to the language of *World-wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980), reminding that "the foreseeability that is critical to due process analysis is ... that the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *Burger King,* 471 U.S. at 474, 105 S.Ct. at 2183 (1985). Accordingly, when a defendant deliberately engages in tortious conduct within a state from beyond its geographical boundaries, that defendant purposely avails itself of the privilege of conducting activities within the forum state and cannot be heard to complain that jurisdiction was predicated on "random, fortuitous, or attenuated" contacts. *Keeton,* 465 U.S. at 774, 104 S.Ct. at 1478. Thus, as stated in *Burger King,* 471 U.S. at 476, 105

S.Ct. at 2184, "... because his activities are shielded by the 'benefits and protections' of the forum laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well."

Under Fed.R.Civ.P. 4(e) a federal district court is permitted to exercise personal jurisdiction over a non-resident to the extent allowed by rule of court of the state in which the district court is located. New Jersey's Long Arm Statute, Rule 4:4–4(c)(1) permits the exercise of jurisdiction "consistent with due process of law." In *Charles Gendler & Co. v. Telecom Equip. Corp.,* 102 N.J. 460, 469, 508 A.2d 1127 (1986), the New Jersey Supreme Court stated that New Jersey permits out-of-state service "to the uttermost limits permitted by the United States Constitution."

Plaintiff does not assert that these defendants have a continuous presence in New Jersey, thereby becoming generally amenable to the jurisdiction of this district. Rather, plaintiff claims that this court has "specific jurisdiction" over these defendants due to their contact with New Jersey arising from the wrongful conduct at issue. *See Provident National Bank v. California Federal Savings & Loan Assoc.,* 819 F.2d 434, 437 (3d Cir.1987) (general *in personam* jurisdiction sustained); *Educational Testing Service v. Katzman,* 631 F.Supp. 550, 554 (D.N.J.1986) (reviewing the Third Circuit's two-step analysis for determining whether jurisdiction may be asserted over a nonresident defendant). *But see Dollar Savings Bank v. First Security Bank of Utah,* 746 F.2d 208, 211 (3d Cir.1984) (jurisdiction denied).

■ Because the defendants each raise a jurisdictional defense and have no continuing forum presence, Regency bears the burden of particularizing sufficient minimum contacts between them and the State of New Jersey. *Paolino v. Channel Home Centers,* 668 F.2d 721 (3d Cir.1981). A relationship among the defendants, the forum and the litigation is the essential foundation of *in personam* jurisdiction. *Shaf-*

*fer v. Heitner,* 433 U.S. at 204, 97 S.Ct. at 2579.

Regency asserts that the dealers' presence in this litigation is appropriate because their conduct arises from forum related activity. Regency attempts to buttress its argument by reliance on *Calder v. Jones, supra.* In that case, defendants wrote and edited a libelous article in Florida for a national magazine that had its largest circulation in California. Personal jurisdiction in California was sustained on the theory that those who authored and edited the article intended to, and did, cause tortious injury to the targeted individual in California. Justice Reinquist, in sustaining jurisdiction, noted:

> In sum, California is the focal point both of the story and the harm suffered. Jurisdiction over petitioners is therefore proper in California based on the 'effects' of their Florida conduct in California.

*Calder,* 465 U.S. at 790, 104 S.Ct. at 1486–1487. Since the defendant-petitioners in *Calder* engaged in intentional and tortious conduct and could foresee the devastating impact of their article in California, they then must have "reasonably anticipate[d] being haled into court there." *World-wide Volkswagen Corp. v. Woodson,* 444 U.S. at 297, 100 S.Ct. at 567.

▆ In the instant case, a comparison of the defendant-dealers' conduct with that which occurred in *Calder* clearly demonstrates that an assertion of *in personam* jurisdiction as to each defendant-dealer fails to pass constitutional muster. *See Rush v. Savchuk,* 444 U.S. 320, 332, 100 S.Ct. 571, 579, 62 L.Ed.2d 516 (1980) (each defendant-dealer's contacts with New Jersey must be assessed individually). Though the tone of the dealers' letters was angry, rhetoric of indignation falls far short of the requisite intentional tortious conduct required to establish personal jur-

isdiction. For example, the letters written by the dealer-defendants to GM representatives were addressed to nonforum locations and were more in the nature of an inquiry than a call-to-action. Moreover, the substance of these letters focused on the dealers' concerns over what was occurring to them and their customers in their specific geographical areas.[7] None of these dealers at any time contacted Regency or implemented any plans to curb Regency's nationwide sales program. The record before the court is therefore totally devoid of any conduct, direct or indirect, that would lead any of these dealers to reasonably anticipate their being haled into court in New Jersey as a result of their correspondence with GM. For this court to accede to Regency's retention of jurisdiction over these dealers would impede commercial discourse and foster a sense of unwarranted reticence for fear of being sued.

## IV. CONCLUSION

For the reasons set forth, the court finds a lack of *in personam* jurisdiction as to each defendant and, therefore, will dismiss Counts 10, 11, 12, 14, 15 and 16 of the amended complaint.

An order in conformity with this opinion shall be submitted by counsel for plaintiff.

---

7. In fact, Moore–Hudson and Lyons never received a reply to their letters and the GM response to Childress, if anything, was pro-competition. In pertinent part, response to the Childress stated, "[n]ational marketing of the Plan ... is not inherently a bad thing." It continued, "[w]hen it [marketing of the Plan] is done responsibly, I think it can do much more good than harm for customer satisfaction by selling the Plan to customers who would not otherwise buy it or might not have been exposed to it previously. If we ever conclude that this stops being true, we'll take action." In another part of the letter in commenting on "irresponsible tactics" the author stated, "I don't regard a dealer's aggressive pricing tactics as falling into the same category."