**Phillip D. CASCIOLA, Appellant,**

v.

**F.S. AIR SERVICE, INC., Appellee.**

No. S–11023.

Supreme Court of Alaska.

Sept. 23, 2005.

Phillip D. Casciola, pro se, Bradenton, Florida.

Gregory A. Miller and Daniel C. Kent, Birch Horton Bittner and Cherot, Anchorage, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

Phillip Casciola and his wholly-owned corporation, Jetbroker.com, Inc. ("Jetbroker"), obtained $25,000 from F.S. Air Service, Inc. ("F.S. Air") by misrepresenting Jetbroker's ability to procure two Learjet engines for F.S. Air. F.S. Air sued Casciola and Jetbroker for misrepresentation and breach of contract after Jetbroker failed to deliver the engines or return the deposit. Following summary judgment and a damages trial, Casciola and Jetbroker were held jointly and severally liable for compensatory and punitive damages. Casciola now appeals the partial summary judgment order finding him personally liable for Jetbroker's actions, as

well as the awards of compensatory and punitive damages. We affirm the superior court in all respects.

## II. FACTS AND PROCEEDINGS

### A. Factual Background

F.S. Air is a charter flight service based in Anchorage. F.S. Air has a long-term medevac and personnel transport contract with a hospital in Bethel which requires F.S. Air to be ready to fly on forty-five minutes notice at all times. Two F.S. Air Learjets are dedicated to medevac duty.

Phillip Casciola is a resident of Florida and the founder, sole shareholder, and president of Jetbroker. Jetbroker is ostensibly in the business of buying, selling, and appraising engines and parts for jet aircraft.

In March 2002 the engines of one of F.S. Air's Learjets needed replacement. F.S. Air responded to an advertisement for freshly overhauled Learjet engines from Jetbroker. After inspecting detailed descriptions of the engines provided by Jetbroker, F.S. Air signed a letter drafted by Casciola on March 13, 2002 that listed the terms of the parties' agreement. Jetbroker agreed to broker two engines to F.S. Air in exchange for $100,000 and the cores of F.S. Air's current engines. Jetbroker required an immediate deposit of $25,000 with the remaining $75,000 due upon delivery of the engines. After agreeing to Casciola's terms and signing the letter, F.S. Air's president, Sandra Butler, immediately wired $25,000 to Jetbroker's Florida bank account.

Jetbroker did not deliver the engines. Casciola wrote to F.S. Air on March 26, 2002 that "there seems to be a logbook problem with the engines that we had anticipated securing and outsourcing for you," and asked for "a few more days" to settle the logbook problem. Casciola also asked if F.S. Air wanted Jetbroker to attempt to secure two other engines.

On April 3, 2002 Sandra Butler asked Casciola to return the $25,000 deposit because the two engines that Jetbroker had agreed to broker were unavailable. Casciola agreed to refund the deposit but asked F.S. Air to release Jetbroker from the March 13 agree-

ment. F.S. Air agreed to release Jetbroker from the agreement as long as Jetbroker returned the $25,000. Casciola responded by asking for a mutual release and offering to secure other suitable engines for F.S. Air. On April 15, 2002 Sandra Butler signed and delivered a mutual release to Jetbroker—once again asking Jetbroker to refund the deposit. Casciola replied that the mutual release would be acceptable with a "few minor changes" but expressed his hope that the release would be unnecessary and that F.S. Air would allow Jetbroker to locate alternative engines. F.S. Air accepted Jetbroker's changes and informed Jetbroker that F.S. Air had secured engines from another source and desired "nothing further to do with [Jetbroker], except to get its money back." F.S. Air also promised to file suit against Jetbroker if the deposit was not promptly refunded.

On April 19, 2002 Jetbroker replied that the contract provided more than twenty business days to perform and expressed dissatisfaction that F.S. Air had purchased engines through another vendor. Because F.S. Air no longer needed engines, Jetbroker offered to provide "some other type of aviation related service or product" to "earn our fees." Jetbroker also requested that the parties submit their dispute to mediation, but approved of the mutual release. F.S. Air replied by demanding that Jetbroker refund the deposit and reiterating that there "is no possibility of F.S. Air doing *any* further business with [Jetbroker]." On April 22, 2002 F.S. Air filed this suit.

### B. Proceedings

F.S. Air's complaint advanced claims for breach of contract against Jetbroker and intentional and negligent misrepresentation against Jetbroker and Casciola. F.S. Air asked for compensatory and punitive damages.

Casciola did not obtain counsel for Jetbroker or himself. He has attempted to represent Jetbroker and himself *pro se* throughout the proceedings below and this appeal. He filed an answer and counterclaim on behalf of himself and Jetbroker in May 2002. In July 2002 the superior court grant-

ed F.S. Air's Motion to Strike Jetbroker's Answer and Counterclaim because Jetbroker had not obtained corporate counsel as required by AS 22.20.040. Superior Court Judge Eric Sanders ordered Jetbroker to obtain corporate counsel by August 7, 2002. Jetbroker did not obtain corporate counsel, and Judge Sanders entered a default judgment against Jetbroker on August 21, 2002 for "failure to appear and answer or otherwise defend this action."

In October 2002 F.S. Air moved for partial summary judgment against Casciola for misrepresentation both in his personal capacity and in his role as an officer/shareholder for a sham corporation. Casciola did not oppose F.S. Air's motion. Judge Sanders granted the motion without an opinion on November 7, 2002.

Casciola also failed to respond to F.S. Air's discovery requests. F.S. Air moved to compel discovery and deem its Requests for Admission to be admitted. Casciola did not oppose the motion or respond to F.S. Air's earlier discovery requests. Judge Sanders granted F.S. Air's motion on November 28, 2002. Among other facts, Casciola was deemed to have admitted that neither he nor Jetbroker possessed the advertised engines between March 2002 and September 2002 and that neither he nor Jetbroker possessed the "authority to broker or sell the two jet engines involved in this case."

The case proceeded to trial on compensatory and punitive damages. Casciola submitted an "Answer to Plaintiff's Trial Brief" but did not otherwise participate in the trial. Superior Court Judge Phillip R. Volland conducted a bench trial on February 27, 2002. Judge Volland found that F.S. Air had proven by a preponderance of the evidence that it had been injured in the amount of $30,000

and held Jetbroker and Casciola jointly and severally liable for the damages.

Judge Volland also determined that F.S. Air had shown by clear and convincing evidence that "[d]efendants' conduct was outrageous, malicious, and done with bad motives and/or reckless indifference to F.S. Air's interests, to deliberately pocket F.S. Air's $25,000 for Defendant's own financial profit and to F.S. Air's detriment.... Defendants' actions also appear ... to have been ... part of a series of deliberate actions." Judge Volland held Jetbroker and Casciola jointly and severally liable for $300,000 in punitive damages.

Casciola appeals.

## III. STANDARD OF REVIEW

■■ We review a grant of summary judgment *de novo*.[1] We will affirm if there are no genuine issues of material fact and if the movant is entitled to judgment as a matter of law.[2] Since *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*,[3] we review *de novo* whether a punitive damages award is grossly excessive under the due process clause of the Fourteenth Amendment.[4]

## IV. DISCUSSION

### A. Casciola's Briefing Is Adequate Only in Regard to His Arguments Concerning Punitive Damages and Piercing the Corporate Veil.

■■ We do not consider arguments that are inadequately briefed.[5] We have held that where a point is specified as error in a brief on appeal, but the point is "not given more than cursory statement in the argument portion of the brief, [it] will not be considered" by the court but will be treated as abandoned.[6] We apply a more lenient

---

1. *Alakayak v. British Columbia Packers, Ltd.*, 48 P.3d 432, 447 (Alaska 2002).

2. *Id.*

3. 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) (instructing appellate courts to review constitutionality of punitive damages awards *de novo* ).

4. *Central Bering Sea Fishermen's Ass'n v. Anderson*, 54 P.3d 271, 277 (Alaska 2002). Prior

to *Cooper Industries*, we reviewed a lower court's decision on a motion for remittitur or new trial regarding punitive damages for abuse of discretion. *Id.*

5. *Lewis v. State*, 469 P.2d 689, 692 n. 2 (Alaska 1970).

6. *Id. See also Great Divide Ins. Co. v. Carpenter ex rel. Reed*, 79 P.3d 599, 608 n. 10 (Alaska 2003) ("Points that are inadequately briefed are considered waived.").

standard to *pro se* litigants.[7] To avoid waiver, a *pro se* litigant's briefing must allow his or her opponent and this court to discern the *pro se's* legal argument.[8] Even a *pro se* litigant, however, must cite authority and provide a legal theory.[9]

Casciola's briefing on appeal is for the most part insufficient and difficult to follow. Because his argument[10] regarding the compensatory award does not allege any errors by the superior court or articulate a legal theory, we will not consider it. But his argument that the superior court erred by piercing the corporate veil and holding him personally liable for Jetbroker's misdeeds and his argument that the punitive damages award was inappropriate outline recognizable legal theories and cite identifiable authorities. Given our lenient stance towards *pro se* litigants, we will address these two arguments.

## B. Casciola Is Liable for the Compensatory and Punitive Damages Award Regardless of his Personal Liability for Jetbroker.

As noted, F.S. Air named Casciola as a defendant in his individual capacity based on his intentional misrepresentations.[11] F.S. Air moved for partial summary judgment on two issues: (1) Casciola's liability for misrepresentation, and (2) Casciola's personal liability for Jetbroker's corporate wrongdoing. Casciola failed to oppose the motion, and Judge Sanders granted partial summary judgment. Following trial, Judge Volland entered an order noting that "Judge Sanders previously ruled in this matter that F.S. Air is entitled to judgment from both Defendants." Judge Volland determined that Jetbroker and Casciola were jointly and severally liable to F.S. Air in the amount of the $30,000 for compensatory damages and $300,000 for punitive damages. Casciola has not challenged on appeal either Judge Volland's conclusion that he is jointly liable, or Judge Sanders's finding of liability in his personal capacity for his individual acts of misrepresentation.

Instead, Casciola contends that Judge Sanders erred in granting summary judgment to F.S. Air regarding his personal liability for Jetbroker's wrongdoing. He argues that there was insufficient proof before Judge Sanders that Jetbroker functioned as a mere instrumentality of his will.[12] We

7. *Breck v. Ulmer*, 745 P.2d 66, 75 (Alaska 1987) (citing *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)).

8. *Peterson v. Ek*, 93 P.3d 458, 464 n. 9 (Alaska 2004).

9. *Id.*

10. Casciola's compensatory damages argument consists only of a paragraph requesting us to review a long list of cases in which awards were reduced on appeal. No citations are provided for these cases. The submission is unreviewable.

11. All persons may be found liable for their own intentional tortious conduct, including acts of fraudulent misrepresentation. The corporate form does not shield corporate officers or employees who commit torts on behalf of their employer from personal liability. As an Oregon appellate court has stated, "[t]here is no reason to protect corporate officers or employees who authorize, direct and participate in tortious conduct by their corporate principal. If the corporation commits a tort as a result of intentional action on the part of its officers or employees, these agents are also responsible." *Schram v. Albertson's, Inc.*, 146 Or.App. 415, 934 P.2d 483, 491 (1997) (*quoting Wampler v. Palmerton*, 250 Or. 65, 77, 439 P.2d 601 (1968)). *See also Scrib-*

*ner v. O'Brien, Inc.*, 169 Conn. 389, 363 A.2d 160, 168 (1975) (when "an agent or officer commits or participates in the commission of a tort, whether or not he acts on behalf of his principal or corporation, he is liable to third persons injured thereby."); *Robsac Indus., Inc. v. Chartpak*, 204 N.J.Super. 149, 497 A.2d 1267, 1271 (App. Div.1985) ("Corporate officers are personally liable to persons injured by their own torts, even though they were acting on behalf of the corporation and their intent was to benefit the corporation."); *Oxmans' Erwin Meat Co. v. Blacketer*, 86 Wis.2d 683, 273 N.W.2d 285, 289 (1979) ("An individual is personally responsible for his own tortious conduct. A corporate agent cannot shield himself from personal liability for a tort he personally commits or participates in by hiding behind the corporate entity; if he is shown to have been acting for the corporation, the corporation also may be liable, but the individual is not thereby relieved of his own responsibility."). We do not address whether the corporate form shields individuals from liability for negligent torts committed on behalf of the corporation.

12. In *Uchitel Co. v. Telephone Co.*, 646 P.2d 229, 234–35 (Alaska 1982), we held that it was appropriate to pierce the corporate veil and hold a dominant shareholder personally liable for a corporation's wrongdoing if the corporation

need not address this argument. Even if F.S. Air were not entitled to summary judgment regarding Casciola's personal liability for Jetbroker, Casciola has not contested that he would still be jointly liable in his individual capacity for both punitive and compensatory damages because of his misrepresentations. Consequently, a reversal would not alter Casciola's liability, and error, if any, would be harmless.

### C. The Punitive Damages Award Is Not Excessive.

Casciola does not appeal Judge Volland's ruling that "F.S. Air has shown by clear and convincing evidence that F.S. Air is entitled to recover punitive damages, jointly and severally, from Jetbroker and Casciola." Rather, Casciola contests the amount of punitive damages awarded, arguing that a $300,000 award is "grossly excessive" in comparison to the $30,000 compensatory award. Because Casciola engaged in extremely reprehensible conduct, Alaska case law and statutory law gave notice that a high ratio between punitive and compensatory damages was possible, and since a large award is necessary to deter this type of fraud, we conclude that the

award does not violate either Alaska or federal law.

### 1. The punitive damages award does not violate Alaska law.

Casciola has not argued that the punitive award violates Alaska law. Consequently, we would not ordinarily address the application of Alaska law to the punitive award. However, in light of Casciola's claim that the punitive award violates federal due process, and the emphasis placed by the United States Supreme Court on the reprehensibility of misconduct and the existence of comparable civil and criminal penalties for particular misconduct,[13] we review Alaska law on punitive damages and on civil and criminal penalties for comparable misconduct as a guide.

As a preliminary matter, we note that Alaska law does not prescribe a fixed ratio, or range of ratios, between punitive and compensatory damages.[14] Though both AS 09.17.020 and the United States Supreme Court suggest that three- or four-to-one ratios between punitive and compensatory damages are appropriate,[15] we have upheld

---

functioned as the "mere instrumentality" of the dominant shareholder. To determine when a corporation functioned as the mere instrumentality of its dominant shareholder, we adopted a six-part test adapted from the eleven-part test announced in *Jackson v. General Electric Co.*, 514 P.2d 1170 (Alaska 1973), for piercing the corporate veil in the context of a parent corporation's liability for its subsidiary. *Uchitel*, 646 P.2d at 235. The six-part test instructed:

> In adapting the quantitative approach from the parent-subsidiary cases to the individual shareholder-corporation context the following factors should be considered: (a) whether the shareholder sought to be charged owns all or most of the stock of the corporation; (b) whether the shareholder has subscribed to all of the capital stock of the corporation or otherwise caused its incorporation; (c) whether the incorporation has grossly inadequate capital; (d) whether the shareholder uses the property of the corporation as his own; (e) whether the directors or executives of the corporation act independently in the interest of the corporation or simply take their orders from the shareholder in the latter's interest; (f) whether the formal legal requirements of the corporation are observed.

*Id. See also Nerox Power Systems, Inc. v. M–B Contracting Co.*, 54 P.3d 791 (Alaska 2002) (articulating *Uchitel* quantitative test in slightly modi-

fied form). *Uchitel* also held that a dominant shareholder could be held personally liable for corporate acts "if the corporate form is used 'to defeat public convenience, justify wrong, commit fraud, or defend crime.' " *Id.* at 234 (citation omitted). In this case, Casciola claimed that F.S. Air had not presented sufficient evidence of the elements of the six-part test for instrumentality to justify summary judgment. We decline to evaluate this claim because Casciola will remain liable for the entire judgment even if we were to reverse on this issue. We do note, however, that Casciola failed to address F.S. Air's assertion that piercing the corporate veil was appropriate because Casciola used Jetbroker as a front for fraud. Such abuse of the corporate form may justify piercing the corporate veil even in the absence of a showing of instrumentality. *Id.*

**13.** *See BMW of N. America v. Gore,* 517 U.S. 559, 574–75, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). *See also infra* Part IV.C.2.

**14.** *Fyffe v. Wright,* 93 P.3d 444, 457 (Alaska 2004) (citing *Norcon, Inc. v. Kotowski,* 971 P.2d 158, 175–77 (Alaska 1999)).

**15.** *See* AS 09.17.020(f)(1), (g)(1)-(2); *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 425, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003)

punitive damages far in excess of these ratios.[16] Our reluctance to adopt a fixed ratio is motivated in part by the fact that punitive damage awards must be tailored to case-specific facts in order to achieve optimal deterrence and punishment.[17] Where compensatory damages may be small relative to the cost of litigating, or where the nature of a tortfeasor's scheme makes deterrence and punishment difficult, a higher ratio may be necessary to create the incentives necessary to vindicate Alaska's legitimate interest in preventing particularly malignant conduct.[18]

Alaska Statute 09.17.020(c) identifies seven factors relevant to the determination of an appropriate punitive damages award:

(1) the likelihood at the time of the conduct that serious harm would arise from the defendant's conduct;

(2) the degree of the defendant's awareness of the likelihood described in (1) of this subsection;

(3) the amount of financial gain the defendant gained or expected to gain as a result of the defendant's conduct;

(4) the duration of the conduct and any intentional concealment of the conduct;

(5) the attitude and conduct of the defendant upon discovery of the conduct;

(6) the financial condition of the defendant; and

(7) the total deterrence of other damages and punishment imposed on the defendant as a result of the conduct, including compensatory and punitive damages awards to persons in situations similar to those of the plaintiff and the severity of the criminal penalties to which the defendant has been or may be subjected.

■ These factors are well-represented in this case. Casciola intentionally deceived F.S. Air in order to obtain $25,000,[19] and he continued to lie to F.S. Air to conceal his fraud and to delay legal action.[20] The facts admitted by Casciola strongly resemble criminal conduct[21] and could form the basis for charges carrying substantial fines and jail

---

(four-to-one ratio of punitive to compensatory damages may approach constitutional line). Note that AS 09.17.020, by its terms, permits juries to depart from these suggested ratios, so long as the total punitive damages award falls within the maximum dollar-value statutory cap.

**16.** See, e.g., Cent. Bering Sea Fishermen's Ass'n v. Anderson, 54 P.3d 271, 274–77 (Alaska 2002) (approving $600,000 in total punitive damages and $48,000 in compensatory damages for constructive termination and defamation); Laidlaw Transit, Inc. v. Crouse ex rel. Crouse, 53 P.3d 1093, 1096–97 (Alaska 2002) (approving $500,000 in punitive damages and $19,259 in compensatory damages against school bus company that employed drug-using driver); Era Aviation, Inc. v. Lindfors, 17 P.3d 40, 43, 49 (Alaska 2000) (ordering $725,000 punitive award remitted to $500,000 where compensatory damages for emotional distress equaled $50,000); IBEW, Local 1547 v. Alaska Utility Constr. Inc., 976 P.2d 852, 853–55 (Alaska 1999) (affirming $212,500 punitive award against union that engaged in "outrageous" picketing behavior where compensatory damages totaled $11,622.05); Norcon, Inc. v. Kotowski, 971 P.2d 158, 161, 174–77 (Alaska 1999) (ordering $3,000,000 punitive award remitted to $500,000 where compensatory damages totaled slightly more than $10,000 in sexual harassment suit).

**17.** See Norcon, 971 P.2d at 179 (Eastaugh, J., concurring) (discussing desirability of punitive

damage awards that are tailored to provide optimal deterrence given litigation costs).

**18.** Id.

**19.** The superior court deemed Casciola to have admitted that he knowingly entered a contract to sell to F.S. Air jet engines which he did not possess nor have authority to broker or sell, and that, in partial consideration for these engines, F.S. Air paid a $25,000 deposit to Casciola which has not been refunded. Casciola has not attempted to dispute these facts on appeal.

**20.** Casciola initially told F.S. Air that the engines could not be delivered because of a "logbook problem." He then promised to return the deposit if F.S. Air executed a release. After F.S. Air executed a revised release to Casciola's specifications, Casciola explained that he had "engines available for [F.S. Air's] inspection" and proposed continuing to do business but did not return the deposit. Given Casciola's admissions, we are confident that none of these statements was true.

**21.** For example, knowingly taking advantage of another's false impressions to obtain $25,000 could constitute theft by deception, a class B felony. See AS 11.46.100, .120, .180; AS 11.81.900(18). Similarly, Casciola's acts could fit the elements of a scheme to defraud, another class B felony. See AS 11.46.600.

time.[22] Casciola's conduct also resembles a series of unlawful business practices under AS 45.50.471(b).[23] Such unlawful business practices can result in civil penalties of up to $5,000 per violation.[24] Alaska law also specifically authorizes larger punitive awards to punish intentional torts motivated by financial gain.[25]

Additionally, the record supports the conclusion that a substantial penalty is necessary to punish Casciola and to deter him, and others like him, from similar misconduct in the future. Ample evidence demonstrates that Casciola's misconduct in this case was merely one part of an ongoing pattern of fraud and misrepresentation. Casciola appears to have engaged in an identical scheme on at least one previous occasion: Casciola was deemed to have admitted that he was a "defendant in a case filed by Heritage Christian to recover an unreturned $200,000 deposit made by Heritage Christian to purchase a jet." [26] As the superior court noted, Casciola is the sole officer of eight Florida corporations "engaging in jet aircraft engine and part sales and appraisals." During the course of this litigation, Casciola has continued to solicit business from F.S. Air through his other corporations.

A large award is also necessary in order to change the dynamic of Casciola's fraudulent scheme. Currently a victim of Casciola's scheme must choose between accepting a fractional refund, thereby leaving Casciola with undeserved thousands, and pursuing an expensive and uncertain vindication in the courts. F.S. Air faced this difficult choice.[27] At this juncture, it is not clear that F.S. Air would not have been economically better off had it accepted some fractional refund in April or May 2002. Though the nominal values of the awards in this case are quite large, F.S. Air must discount them by the strong possibility that Casciola will never pay. F.S. Air has also spent a great deal of time, energy, and money in seeking its refund. Other victims may allow Casciola to "skim" their deposits in order to make the economic best of a bad situation. Given this dilemma, a large punitive award is necessary to provide victims with an incentive to pursue proper legal action.

## 2. The punitive damages award does not impinge on Casciola's federal due process rights.

Casciola argues that the punitive damages award is grossly excessive and violates the due process clause of the Fourteenth Amendment. We disagree. The award is constitutionally sound given the re-

22. An offender convicted of a class B felony may be sentenced to a maximum of ten years imprisonment, AS 12.55.125(d), and fined as much as $100,000. AS 12.55.035(b)(3).

23. AS 45.50.471(b)(12) defines "using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged" as unlawful business practices.

24. AS 45.50.501(a) authorizes the attorney general to bring an action in the name of the state against parties engaging in practices that violate AS 45.50.471. Pursuant to such an action, a penalty of $5,000 per violation may be assessed against a party who violates AS 45.50.471. *See* AS 45.50.551(b). In addition, injured private parties in this chapter are statutorily authorized to seek treble damages, AS 45.50.531(a), and costs and full reasonable attorney's fees. AS 45.50.537.

25. *Compare* AS 09.17.020(f) *with* AS 09.17.020(g).

26. Heritage Christian Center paid Casciola a $200,000 deposit for the jet but never received the airplane or a refund of its deposit.

27. During April and May 2002 Casciola attempted to delay F.S. Air by requesting a letter releasing Casciola from the contract, then a mutual release between the parties, then changes to the mutual release, and followed by a claim that the contract allowed Casciola more than twenty business days to perform. These letters contained several requests for settlement, even though Casciola had earlier admitted that F.S. Air was entitled to a full refund of the deposit. This behavior culminated in a May 7, 2002 letter in which Casciola expressed his desire to settle and implicitly warned F.S. Air that legal action would be futile because of a "variety of legal and accounting issues." Combined with Casciola's demonstrated bad faith, this line of correspondence communicates a simple message: F.S. Air should "compromise" or get nothing.

prehensibility of Casciola's conduct, the necessity of a large penalty to alter the incentives of this type of fraud, and the potential penalties available under Alaska criminal and civil law.

■ In *BMW of North America, Inc. v. Gore*,[28] the United States Supreme Court recognized that "[p]unitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition."[29] "Only when an award can fairly be categorized as 'grossly excessive' in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment."[30] In relevant part, *Gore* held that a punitive award may be grossly excessive where a tortfeasor lacked notice of the magnitude of the sanction that a state might employ.[31]

■ To determine whether a tortfeasor had fair notice of the potential magnitude of a punitive damages award, the Supreme Court has identified three "guideposts":

(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.[32]

These guideposts are meant to provide a flexible guide to the requirements of due process. In practice, the guideposts identify a range of ratios of punitive to compensatory damages that are presumptively acceptable and prescribe constitutionally permissible reasons for deviating upwards. Though the Supreme Court is careful to say that there is no bright-line rule and that due process cannot mandate a specific ratio, it also notes that statutes authorizing punitive damages extending back 700 years have emphasized double, treble, or quadruple damages and that a four-to-one ratio may be close to the constitutional line.[33] The Court noted that the most important justification for departing upward from the constitutional comfort zone of three- or four-to-one is the reprehensibility of the misconduct.[34] We turn now to an application of the *BMW v. Gore* guideposts.

### a. Casciola's conduct was extremely reprehensible.

■ "[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."[35] The Supreme Court has set out factors to consider in measuring the reprehensibility of the tortious conduct:

We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.[36]

---

**28.** 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). The plaintiff in *Gore* sued BMW for fraud in Alabama court after discovering that his new car had been damaged and the car repainted before delivery. *Id.* at 563, 116 S.Ct. 1589. A jury awarded Gore $4,000 in actual damages and $4,000,000 in punitive damages. *Id.* at 565, 116 S.Ct. 1589. The punitive damages figure reflected the estimated actual damages suffered by all BMW owners in Gore's position nationwide. *Id.* at 564–65, 116 S.Ct. 1589. After the Alabama Supreme Court reduced the award to $2,000,000, BMW appealed to the U.S. Supreme Court. *Id.* at 567, 116 S.Ct. 1589.

**29.** *Id.* at 568, 116 S.Ct. 1589.

**30.** *Id.*

**31.** *Id.* at 574–75, 116 S.Ct. 1589.

**32.** *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (citing *Gore*, 517 U.S. at 575, 116 S.Ct. 1589).

**33.** *Id.* at 424–25, 123 S.Ct. 1513.

**34.** *Id.* at 419, 123 S.Ct. 1513; *Gore*, 517 U.S. at 575, 116 S.Ct. 1589.

**35.** *Campbell*, 538 U.S. at 419, 123 S.Ct. 1513 (citing *Gore*, 517 U.S. at 575, 116 S.Ct. 1589).

**36.** *Id.* (citing *Gore*, 517 U.S. at 576–77, 116 S.Ct. 1589).

While only two of these criteria apply to Casciola's conduct—Casciola's conduct involved intentional deceit and involved a series of misrepresentations (indeed, it appears to be part of a larger pattern of wrongdoing)—the facts in this case more than demonstrate the egregiousness of Casciola's conduct. The analysis undertaken above pursuant to Alaska law shows that Alaska considers Casciola's conduct to be extremely blameworthy. The superior court found that Casciola's actions were "outrageous, malicious and with bad motives ... to deliberately pocket F.S. Air's $25,000 for Defendant's own financial profit and to F.S. Air's detriment." This finding was correct given the undisputed evidence at trial that Casciola's actions were not part of an isolated incident but emblematic of a larger pattern of fraud and that the injuries suffered by F.S. Air flowed from Casciola's "intentional malice, trickery, or deceit."

### b. The ratio of punitive to compensatory damages is not excessive.

■■■ Under the second guidepost, which compares punitive damages with actual damages, the Supreme Court has not prescribed a bright-line rule for when a punitive damages award so far exceeds actual damages that the award violates the due process clause.[37] The Court has noted, however, that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process,"[38] and also has stated that "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety."[39]

This guidepost does not proscribe particular ratios as presumptively unconstitutional. Rather, it is a rule of thumb—a general prediction regarding what ratios will satisfy due process. Whether or not a given ratio does satisfy due process, however, depends on other factors, including analysis under the other two stated guideposts. Due process, as noted by the lower federal courts, allows for larger awards relative to the compensatory damages when appropriate.[40] In this case, the ratio between punitive and actual damages awarded is ten-to-one. While this ratio may exceed the Supreme Court's preference for "single-digit" ratios, it does so only slightly, and it is a far lower ratio than any of those that have actually been invalidated by the Supreme Court.[41] More importantly, we are satisfied that the award is more than adequately justified when the other guideposts—the reprehensibility of the conduct and the civil penalties imposed in comparable cases—are considered, as in the

---

37. *Id.* at 425, 123 S.Ct. 1513.

38. *Id.*

39. *Id.*

40. *See Leatherman Tool Group, Inc. v. Cooper Indus., Inc.,* 285 F.3d 1146, 1151–52 (9th Cir. 2002) (ten-to-one ratio was justified in stolen trade secrets case by need to deter large corporation from such conduct); *Johansen v. Combustion Eng'g, Inc.,* 170 F.3d 1320, 1336–39 (11th Cir.1999) (approving ninety-three-to-one ratio in water pollution case because (1) large fine was necessary to deter large corporate defendant, (2) misconduct caused small injury and was difficult to detect, and (3) defendant was on notice that similar conduct might earn substantial civil penalties); *Kimzey v. Wal–Mart Stores, Inc.,* 107 F.3d 568, 577–78 (8th Cir.1997) (imposing ten-to-one ratio in egregious sexual harassment case). Federal appellate courts have also upheld punitive damage awards that far exceed the ten-to-one ratio in actions under 42 U.S.C. § 1983 where plaintiffs suffered only nominal injuries. *See Williams v. Kaufman County,* 352 F.3d 994, 1016

(5th Cir.2003) (upholding punitive damage award of $15,000 per plaintiff for Fourth Amendment violations); *Lee v. Edwards,* 101 F.3d 805, 810–11 (2d Cir.1996) (holding that *Gore* ratio guidepost does not apply to § 1983 claims where actual damages are nominal). In the context of an action for punitive damages under the Federal Fair Housing Act, 42 U.S.C. §§ 3601–3631, the Fifth Circuit rejected the argument that a punitive damages ratio exceeding ten-to-one required remittitur. *Lincoln v. Case,* 340 F.3d 283, 293 (5th Cir.2003).

41. The Supreme Court has never struck down a punitive award that was only ten times greater than accompanying compensatory award. In *Gore,* the punitive damages equalled 500 times the compensatory damages, which the Court called "breathtaking." 517 U.S. at 582–83, 116 S.Ct. 1589. In *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001), the ratio of punitive to compensatory damages was ninety-to-one. *Id.* at 426, 121 S.Ct. 1678. And in *Campbell,* the ratio was 145–to–one. 538 U.S. at 412, 123 S.Ct. 1513.

other sections of this Opinion. Consequently, while the ratio between the punitive award and the compensatory award is sufficiently high to draw scrutiny, the ratio passes constitutional muster.

### c. There is no disparity between the award and similar punitive damage awards or civil penalties in Alaska.

"The third guidepost in *Gore* is the disparity between the punitive damages award and the 'civil penalties authorized or imposed in comparable cases.' "[42] The Supreme Court has "also looked to criminal penalties that could be imposed."[43] As we have already seen, Alaska law authorizes substantial criminal and civil penalties for the conduct admitted by Casciola, as well as enhanced punitive damages.[44] Given these penalties, Casciola was on notice that he could face harsh punishment for his conduct.

This analysis of the *BMW v. Gore* guideposts leads us to conclude that the punitive damages award here does not violate Casciola's due process rights. Casciola's acts in deceiving F.S. Air in order to steal a large sum of money were highly reprehensible. Casciola was on notice that his conduct could result in severe penalties. A large punitive award is necessary to provide the incentive for victims to seek compensation and to reduce the efficacy of Casciola's scheme. Given these considerations, we conclude that the size of the punitive award does not violate federal due process.

## V. CONCLUSION

Because any error in piercing the veil would be harmless and because the punitive award does not violate due process, we AFFIRM the superior court in all respects.

---

**42.** *Campbell,* 538 U.S. at 428, 123 S.Ct. 1513 (quoting *Gore,* 517 U.S. at 575, 116 S.Ct. 1589).

**43.** *Id.*

**44.** *See supra* Part IV.C.1.