*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| DAVID WILSON, | ) |
| | ) Supreme Court No. S-17491 |
| Appellant, | ) |
| | ) Superior Court No. 1JU-16-00795 CI |
| v. | ) |
| | ) O P I N I O N |
| STATE OF ALASKA, | ) |
| | ) No. 7500 – January 15, 2021 |
| Appellee. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Juneau, Philip M. Pallenberg, Judge.

Appearances: Jon M. Choate and Mark C. Choate, Choate Law Firm LLC, Juneau, for Appellant. Kevin A. Higgins, Assistant Attorney General, and Kevin G. Clarkson, Attorney General, Juneau, for Appellee.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney, Justices. [Borghesan, Justice, not participating.]

BOLGER, Chief Justice.

## I.    INTRODUCTION

The Alaska Department of Corrections investigated its employee David Wilson for potentially criminal misconduct. It ordered him to answer questions from investigators but assured him that his answers and any evidence derived from those answers could not be used against him criminally. Wilson was terminated for refusing to answer and claims that the State violated his constitutional privilege against self-

incrimination by failing to tell his lawyer that his answers to the investigator could not be used against him in a criminal proceeding.

We conclude that by terminating Wilson for refusing to answer those questions, the State of Alaska did not violate his privilege against self-incrimination, under either the U.S. Constitution or the Alaska Constitution. The State did notify Wilson that his answers could not be used against him criminally, and Wilson not only confirmed at the time that he understood this notification, but also in the subsequent court proceedings introduced no evidence to the contrary. We therefore affirm the superior court's grant of summary judgment against Wilson.

## II. FACTS AND PROCEDURAL HISTORY

### A. Facts

In early March 2016 the Department of Corrections (DOC) received a complaint from one of Wilson's subordinates alleging, alongside other grievances, that Wilson had pressured a second subordinate to provide him with her prescribed "narcotic medications." When interviewed, the second subordinate confirmed she provided Wilson with Oxycodone and Methadone on seven or eight occasions between 2011 and 2014. She alleged that "on days when she had called in sick," Wilson "came to her house during work hours" and entered "without knocking." She believed Wilson "took advantage of [her] vulnerability by targeting his requests when he knew [she] would be medicating and compromised." In a later deposition, Wilson admitted he had asked for and accepted medication from his subordinate, explaining he "was challenged with pain issues" at the time, but he never fully adopted his subordinate's description of the alleged events.

On March 8 DOC investigator Terrence Shanigan called Wilson to request an "entirely voluntary" interview; Wilson retained counsel who spoke with Shanigan by phone later that day. Wilson's counsel asked whether the interview had "anything to do

with any potential job discipline," and Shanigan replied, "No." Shanigan identified himself as "a commissioned officer" rather than "an HR person," and said: "I'm only interested in . . . anything that potentially has any criminal nexus to it." Shanigan said Wilson "was free to not answer any questions," and "if he came, he could leave at any time." DOC's initial plan was "to let the criminal case run, then [Shanigan] can decide if it passes muster to file"; only after that would DOC "move on the personnel matters." But DOC quickly changed its approach to pursuing "concurrent" criminal and administrative investigations.

On March 9 Wilson received written notice from DOC's human resources division that he was "required to report" to a March 14 interview "to discuss multiple allegations of misconduct." The key allegations were that he "coerce[d] one of [his] direct reports to share her prescription medication" and took said medication "[o]n at least one occasion."[1] Bold lettering stated that "[d]ue to the potentially criminal nature" of these allegations, Wilson was permitted to "choose not to answer specific questions," which would "not result in negative inferences made against [him]." But the notice also informed Wilson that DOC Standards of Conduct required him to "fully cooperate by providing all information that [he] may have concerning the matter under investigation," adding that "[f]ull cooperation involves responding to all questions truthfully and completely." The notice was silent on whether or not Wilson could have counsel present, stating only that Wilson had the option to arrange to "have a union representative present" in light of "the nature of this meeting." It is unclear whether

---

[1] Wilson was also alleged to have "creat[ed] an unprofessional work environment[,] . . . required direct reports . . . to work off the clock uncompensated," and "not respond[ed] appropriately to [a] medical emergency," but the State has not argued these secondary issues would have independently justified termination.

Wilson ever asked to have counsel present, but DOC's human resources consultant, Greg Gendron, later confirmed such a request would have been denied.

In his first interview, DOC gave Wilson inconsistent signals on whether his answers to questions were compelled, prohibiting their use against him in a criminal proceeding. Human resources consultant Gendron and Investigator Shanigan interviewed Wilson on March 14 in the presence of Wilson's union representative Joel Hill. At the beginning of the interview, Gendron mentioned that "[d]ue to the fact that this matter is under criminal investigation," Wilson "may choose not to answer specific questions." Wilson's union representative Hill clarified that Wilson "will be forthright in answering all of your questions with the exception of, potentially, those related to medications," to which he might "take the Fifth." Gendron indicated that was acceptable and he would "identify specifically those questions" before asking them. Wilson proceeded to answer Gendron's questions, nearly all of which related to his job duties and the other, non-criminal allegations. When Gendron asked questions related to the allegation that Wilson took medication prescribed to his subordinate, Wilson declined to answer, citing the instructions of his attorney.

Midway through the interview, Investigator Shanigan asked Wilson: "Do you feel like this meeting is compelled . . . or that you're voluntarily at this meeting"? Shanigan then attempted to articulate the difference between a compelled and voluntary statement. In so doing, Shanigan told Wilson that the encounter was "a compelled, compulsory interview and what's said in here by [Mr.] Wilson cannot be used in any kind of criminal way," but also that, despite "being in a compelled environment, [Wilson was] still not required to answer [some] questions." When Shanigan asked questions related to prescription medication, Wilson declined to answer, citing instructions from counsel. Shanigan responded: "Okay. And you don't have to answer any of these questions I'm asking you . . . ."

Wilson received a second notice on March 18, ordering him to report to a follow-up interview on March 21. In contrast to the first, the second notice advised Wilson that he "[would] be expected and compelled to answer all questions," and that "refusal to answer a question will be considered insubordination which is also grounds for discipline up to and including dismissal." The notice was silent about any criminal aspect of the allegations and contained no bolded notice that Wilson could decline to answer specific questions, but repeated the language from the first notice instructing Wilson to "fully cooperate" by "responding to all questions" and allowing him to "have a union representative present."

The second interview, on March 21, started with Shanigan reading Wilson a "statement of rights":

> You are hereby ordered to fully cooperate with the investigating officials. Your failure to cooperate will create an objective and subjective fear of termination. . . . You'll be asked questions specifically directed and narrowly related to the performance of your official duties. Statements made during any interviews may be used as evidence of misconduct or as the basis for seeking disciplinary action against you. Any statements made by you during these interviews cannot be used against you in any subsequent criminal proceeding nor can the fruits of any of your statements be used against you in any subsequent criminal proceeding.
>
> If . . . you refuse to answer questions relating to the performance of your official duties, you'll be subject to dismissal.

Shanigan asked if Wilson "underst[ood] each of these rights," to which Wilson responded, "Yes, sir." Shanigan then asked specifically if Wilson understood that failure to "answer all questions truthfully and completely" would be considered "dishonesty" and "grounds for discipline including dismissal," to which Wilson again responded, "Yes." Shanigan then proceeded to ask whether Wilson had any prescriptions for

medication. Wilson responded, "At the instruction of my attorney, I am . . . not going to respond to that question." Shanigan replied, "Okay," and began asking different questions about physical ailments, which Wilson answered. Over the remainder of the interview, Wilson refused, under "instruction from [his] attorney," to answer medication-related questions 24 more times.

On March 30 Wilson received a third notice, nearly identical to the second, requiring him to report for an interview the following day. It again referenced "additional questions to be asked regarding the allegations listed in the letter date[d] March 9, 2016," and again advised Wilson that he "[would] be . . . compelled to answer all questions in this meeting" and that "refusal to answer a question [would] be considered insubordination which is also grounds for discipline up to and including dismissal."

Gendron began the third interview, held on March 31 with the same participants as the previous interviews, by reading a statement of the same rights enumerated in the second interview. Gendron then asked Wilson questions to confirm his understanding:

> MR. GENDRON: . . . Do you understand each of these rights as I have read them to you today?
> MR. WILSON: I believe so, yes.
> MR. GENDRON: . . . [D]o you understand that this is not a criminal investigation and nothing you share in this hearing regarding the stated allegations of misconduct may be used against you in any criminal proceeding?
> MR. WILSON: Yes.
> MR. GENDRON: And do you understand that you are being compelled to be at this meeting and it is not voluntary?
> MR. WILSON: Yes.

Most questions in the third interview concerned the allegations unrelated to medication; Wilson answered these and contested the allegations. But Wilson again refused to

respond to any questions related to medication, declining on six occasions to answer questions "[p]er instruction from [his] attorney."

DOC terminated Wilson on April 4, concluding that he had committed, "at a minimum, gross disobedience and substance abuse." The termination notice cited Wilson's refusal to respond to questions during the second and third interviews, as well as the credible prescription medication allegation. Wilson and his union filed a grievance, claiming DOC "lacked 'Just Cause' and progressive discipline in its decision to terminate."

In response DOC justified its decision solely on the basis of Wilson's "refusal to answer questions after being compelled to do so," which it claimed "was a major violation of the [Alaska Police] Standards of Conduct Policy 202.15." Wilson and his union again appealed via grievance, but DOC insisted "the practice of requiring the employee to fully and truthfully answer all questions on pain of termination . . . is a well-established practice in employment law," quoting treatises and case law on the issue of *Garrity* advisements.[2] DOC additionally stated "the evidence available to the employer of drug misuse" was "independently sufficient to justify dismissal."[3] Wilson's union then withdrew its grievance and decided against pursuing arbitration.

### B.    Procedural History

Wilson sued the State for wrongful termination on three grounds: breach of contract, failure to act in good faith, and violation of due process. The State denied all three claims and moved for summary judgment. The State asserted that both "requesting narcotic pain medication from his supervisee and refusing to answer

---

[2]    *See Garrity v. New Jersey*, 385 U.S. 493, 500 (1967) (holding police officers could not be forced to choose between forfeiting their employment and exercising their privilege against self-incrimination).

[3]    *See* 13 Alaska Administrative Code (AAC) 85.270(b)(2)(B) (2020).

questions after being specifically compelled to do so . . . violated DOC's rules of conduct," and that either served as sufficient cause to terminate Wilson's employment. The State explained that "refusal to answer questions . . . is insubordination" and "insubordination is appropriate grounds for discharge."

Wilson also moved for summary judgment, claiming the State violated his "right to due process" when it gave him "conflicting and contradictory information" during uncounseled interviews with respect to whether or not his answers could be used against him criminally. Wilson argued these actions left him with no "opportunity to respond to the very allegations that were the reason for his dismissal." At oral argument on the parties' cross motions for summary judgment, Wilson resisted the notion that he "should be able to figure . . . out" when the State's "hats have switched" from criminal to administrative without the presence of counsel. Wilson asserted that if he "had an opportunity . . . to tell his story," he would have been able to discuss his "chronic and terrible back condition."

The State argued that it had duly notified Wilson he was compelled to answer all questions, that refusal to answer would be considered grounds for termination, and that neither his answers nor the fruits of those answers could be used against him in any criminal proceeding. The State emphasized that, when asked at both the second and third interviews if he understood these rights, Wilson affirmed that he did.

In May 2019 the superior court granted the State's motion for summary judgment. Wilson, the court said, "was terminated for refusing to answer the questions," but the court also speculated that if Wilson had "answered the questions by admitting to obtaining drugs from his subordinate, he would have been terminated for this misconduct." The court characterized Wilson as arguing "that he was not properly advised that his answers to questions in the interviews could not be used against him in any subsequent criminal prosecution." It rejected this argument because "Wilson was

in fact advised" of that information, and "as a matter of law his answers could not have been used against him." Noting a lack of material dispute over these facts, the court thus ruled against Wilson's wrongful termination action "as a matter of law."

Wilson appeals.

## III. STANDARD OF REVIEW

We review a trial court's grant of summary judgment de novo.[4] After drawing all "reasonable inferences from the evidence in favor of the non-moving party, summary judgment is appropriate only when no reasonable person could discern a genuine factual dispute on a material issue."[5] We also review constitutional questions de novo, "adopt[ing] the rule of law that is most persuasive in light of precedent, reason, and policy."[6]

## IV. DISCUSSION

### A. The State Did Not Violate Wilson's Due Process Rights By Firing Him For Refusing To Answer Questions After Receiving *Garrity* Advisements.

The privilege against self-incrimination is enshrined in both article I, section 9 of the Alaska Constitution and the Fifth Amendment of the U.S. Constitution, made applicable to states through the Due Process Clause of the Fourteenth Amendment.[7] This privilege protects an individual from being forced "to answer official

---

[4] *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 516 (Alaska 2014).

[5] *Id.* at 520.

[6] *Anderson v. Alaska Hous. Fin. Corp.*, 462 P.3d 19, 25 (Alaska 2020) (quoting *Dennis O. v. Stephanie O.*, 393 P.3d 401, 405-06 (Alaska 2017)).

[7] Alaska Const. art. I, § 9 ("No person shall be compelled in any criminal proceeding to be a witness against himself."); U.S. Const. amend. V ("No person shall . . . be compelled in any criminal case to be a witness against himself."); U.S.

(continued...)

questions put to him . . . where the answers might incriminate him in future criminal proceedings."[8] An individual enjoys this protection and "may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant."[9]

Wilson argues the State violated his right against self-incrimination, and thus his due process rights, by firing him for refusing to answer questions without having adequately assured him his answers could not be used against him criminally. Even though the State informed Wilson of this protection during the interviews in question, Wilson objects to the State's failure to inform Wilson's *attorney* of this protection, particularly as one of the State's interviewers had previously told Wilson's attorney his sole interest was in criminal investigation.

### 1. A circuit split has developed over whether a State must notify employees of their immunity before compelling testimony.

The U.S. Supreme Court first established that the privilege against self-incrimination protects public employees compelled to answer questions under threat of termination in *Garrity v. New Jersey*.[10] In *Garrity* public employees accused of wrongdoing were warned that anything they said might be used against them criminally

---

[7]    (...continued)
Const. amend. XIV, § 1 ("No state shall . . . deprive any person of life, liberty, or property, without due process of law."); *see Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding the Fourteenth Amendment protects the Fifth Amendment privilege against self-incrimination from infringement by states).

[8]    *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973).

[9]    *Id*. at 78 (citing *Kastigar v. United States*, 406 U.S. 441 (1972)).

[10]    385 U.S. 493 (1967).

but that if they refused to answer questions they could lose their positions.[11]  The Court concluded the resulting statements were coerced because "[t]he choice given [the employees] was either to forfeit their jobs or to incriminate themselves," which was "the antithesis of free choice to speak out or to remain silent."[12]  Thus the constitutional privilege against compelled self-incrimination "prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office."[13]

In *Gardner v. Broderick* the U.S. Supreme Court extended *Garrity* to protect a police officer from being fired for refusing to waive his Fifth Amendment rights.[14]  But the *Gardner* court added that if the officer had instead "refused to answer questions . . . narrowly relating to the performance of his official duties, without being required to waive [that] immunity," then "the privilege against self-incrimination would not have been a bar to his dismissal."[15]

In *Lefkowitz v. Turley* the U.S. Supreme Court rephrased the duties of states to their employees:  to compel answers "elicited upon the threat of the loss of employment" and make good on that threat, a state "must offer to the witness whatever immunity is required to supplant the privilege" against self-incrimination.[16]  A state may

---

[11]     *Id.* at 494-95.

[12]     *Id.* at 497.

[13]     *Id.* at 500.

[14]     392 U.S. 273, 278-79 (1968); *see also Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation of City of New York*, 392 U.S. 280, 284-85 (1968) (extending *Garrity* and *Gardner* to all public employees).

[15]     *Gardner*, 392 U.S. at 278.

[16]     414 U.S. 70, 85 (1973) (striking down as unconstitutional statutes disqualifying government contractors who refused to answer relevant questions or waive

(continued...)

"insist that employees either answer questions under oath about the performance of their job or suffer . . . loss of employment," but only if those employees are "given adequate immunity" such that their answers or the fruits of those answers cannot be used against them in criminal proceedings (i.e. given use and derivative-use immunity).[17]

That statements in a compelled interview of a public employee and fruits of those statements cannot be used against the employee in a criminal proceeding is thus well-established under federal law.[18] But whether states must affirmatively grant or advise employees of this immunity is far from settled. We have not previously resolved the issue,[19] and federal courts diverge markedly in their approaches.

---

[16] (...continued) immunity).

[17] *Id*. at 84.

[18] While *Garrity*, 385 U.S. at 500; *Gardner*, 392 U.S. at 278-79; *Uniformed Sanitation Men*, 392 U.S. at 284-85; and *Lefkowitz*, 414 U.S. at 85, all involved compelled in-court testimony, their logic applies equally to statements compelled at investigative interviews, and the State does not dispute this point. *See Lefkowitz*, 414 U.S. at 77 ("The [Fifth] Amendment . . . privileges [the individual] not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings."); *see also Sher v. U.S. Dep't of Veterans Affairs*, 488 F.3d 489, 501, n.8 (1st Cir. 2007) ("[T]he constitutional prohibition on compulsory self-incrimination also applies to statements made in an administrative investigation." (citing *Kastigar v. United States*, 406 U.S. 441, 444-45 (1972))).

[19] We resolved two previous cases on the issue of compelled testimony under our "inherent supervisory powers," not the constitutional privilege against self-incrimination. *See C.D. v. State*, 458 P.3d 81, 88 (Alaska 2020) (for testimony by a minor during his juvenile waiver hearing); *McCracken v. Corey*, 612 P.2d 990, 997-98 (Alaska 1980) (for evidence presented by a parolee at a revocation hearing facing a later criminal trial for the same conduct).

Four circuits have held immunity attaches automatically as soon as public employers compel their employees' statements, rendering any affirmative grant of use immunity duplicative; these circuits do not require states to affirmatively grant immunity — and have not required states to advise employees of their immunity — before terminating employees for refusing to answer questions.[20] These circuits read *Lefkowitz* and its brethren to mean the government violates the Fifth Amendment "only by . . . both compelling the employee to answer incriminating questions and compelling the employee to waive immunity from the use of those answers."[21] They reason that "the mere failure affirmatively to offer immunity is not an impermissible attempt to compel a waiver of immunity," and so termination based on an employee's refusal to answer

---

[20] *See Aguilera v. Baca*, 510 F.3d 1161, 1172 n.6 (9th Cir. 2007) ("*Gardner* does not require . . . that a public employer must expressly inform an employee that his statements regarding actions within the course and scope of his employment cannot be used against him in a criminal proceeding before taking administrative action against that employee."); *Hill v. Johnson*, 160 F.3d 469, 471 (8th Cir. 1998) ("Even if [employee] was not expressly told that his answers at the meeting and polygraph examination could not be used against him in the criminal prosecution, the mere failure affirmatively to offer immunity is not an impermissible attempt to compel a waiver of immunity."); *Hester v. City of Milledgeville*, 777 F.2d 1492, 1496 (11th Cir. 1985) (holding state need not affirmatively tender immunity to employees before compelling a polygraph because "absent waiver, [immunity] automatically attaches to compelled incriminating statements as a matter of law" so "any grant of use immunity to the plaintiffs would have been duplicative"); *Gulden v. McCorkle*, 680 F.2d 1070, 1075 (5th Cir. 1982) (holding state did not violate employees' Fifth Amendment rights by discharging them for refusing to take polygraphs because "[i]t is the very fact that the testimony was compelled which prevents its use in subsequent proceedings, not any affirmative tender of immunity"), *cert. denied*, 459 U.S. 1206 (1983).

[21] *Hill*, 160 F.3d at 471.

when the employer has not demanded an explicit immunity waiver does not violate the Fifth Amendment.[22]

Two circuits have described immunity as automatic even while noting that special circumstances might require states to advise employees of their immunity under *Garrity*.[23] Another held *Garrity* immunity attached automatically when a public employee "faced the loss of his job for refusal to testify," but declined to impose an affirmative duty to notify because the employee had constructive notice of immunity based on a letter "clearly contain[ing] a threat of removal" that should have prompted the employee's attorneys to explain that compelled statements are protected.[24]

Three circuits require state employers to affirmatively notify employees of the immunity attached to compelled statements before terminating them for refusing to answer questions.[25] This minority requirement reflects the language in *Lefkowitz* that to

---

[22] *Id*.; *see also Gulden*, 680 F.2d at 1074.

[23] *Wiley v. Mayor of Baltimore*, 48 F.3d 773, 777 n.7 (4th Cir. 1995) (observing that despite the "self-executing" nature of *Garrity* immunity, "[i]n an appropriate case, it might be necessary to inform an employee about its nature and scope," but explaining that no such need arose where an officer had not even "attempted to invoke his Fifth Amendment rights" to remain silent); *Grand Jury Subpoenas Dated Dec. 7 & 8 v. United States*, 40 F.3d 1096, 1102 n.5 (10th Cir. 1994) ("While this case does not require us to decide whether the government must affirmatively advise a police officer who is undergoing an internal affairs interview that the officer is not being forced to waive his or her Fifth Amendment rights, other circuits arguably have adopted such a requirement.").

[24] *Sher v. U.S. Dep't of Veterans Affairs*, 488 F.3d 489, 502-06 (1st Cir. 2007).

[25] *See Confederation of Police v. Conlisk*, 489 F.2d 891, 895 (7th Cir. 1973) (holding discharges of police officers for invoking the privilege against self-incrimination unconstitutional when "the officers were not advised that their answers (continued...)

-14- **7500**

compel answers with "the threat of the loss of employment," a state "must *offer* to the witness whatever immunity is required to supplant the privilege."[26] The Seventh Circuit calls this the "anti-mousetrapping rule" and states that people "are much more likely to know about their 'Fifth Amendment' right than they are to know about an immunity that qualifies the right. Asked to give answers to questions put to them in the course of an investigation of their arguably criminal conduct, they may instinctively 'take the Fifth' and by doing so unknowingly set themselves up to be fired without recourse."[27] Dissenting in *Aguilera v. Baca*, Chief Judge Kozinski reasoned that "[a]utomatic immunity . . . leaves a public employee 'in substantially the same position as if the

---

[25] (...continued)
would not be used against them in criminal proceedings"); *Weston v. U.S. Dep't of Hous. & Urban Dev.*, 724 F.2d 943, 948 (Fed. Cir. 1983) (concluding states may "compel[] answers to pertinent questions about the performance of an employee's duties . . . when that employee is duly advised of his options to answer under the immunity granted or remain silent and face dismissal"); *Uniformed Sanitation Men Ass'n v. Comm'r of Sanitation of City of New York*, 426 F.2d 619, 625-27 (2d Cir. 1970) (concluding public employees may be dismissed when, after being "duly advised of [their] options and the consequences of [their] choice," they refuse to answer "pertinent questions about the performance of [their] duties").

[26] *Lefkowitz v. Turley*, 414 U.S. 70, 85 (1973) (emphasis added).

[27] *Atwell v. Lisle Park Dist.*, 286 F.3d 987, 989-90 (7th Cir. 2002); *see also Aguilera v. Baca*, 510 F.3d 1161, 1175 (9th Cir. 2007) (Kozinski, C.J., dissenting) ("[T]he employer must not play on this ambiguity to the disadvantage of the employee; rather, it must clarify whether it is questioning the employee in its capacity as an employer or as a law enforcer."); *cf. Benjamin v. City of Montgomery*, 785 F.2d 959, 962 (11th Cir. 1986) ("[W]e cannot require public employees to speculate whether their statements will later be excluded under *Garrity*.").

[employee] had claimed his privilege,' " thus allowing answers to be compelled, only "when the employee *knows* without a doubt that he has immunity."[28]

This minority rule — that a state must advise its employees that their answers may not be used against them criminally before it can fire them for refusing to answer — is clear, simple, and fair.  It minimizes confusion and prevents the state from exploiting the ambiguity created by its dual roles of employer and law enforcement agency.[29]  But we need not adopt this rule today.  Wilson was fully informed that his compelled statements could not be used against him and therefore cannot prove a constitutional violation under even the most protective standard.

> **2.     The State properly advised Wilson of his rights, and Wilson introduced no evidence of confusion about those advisements.**

The State twice advised Wilson of his immunity.  Wilson twice affirmed he understood that advisement and has submitted no evidence to the contrary.  Therefore, even if we did require the State to notify employees at compelled interviews of *Garrity* immunity, Wilson would fail to show a violation of his privilege against self-incrimination.

Wilson has never argued that the State's advisement to him during his second or third interview was inaccurate as to the scope of his immunity under the Alaska Constitution.[30]  And Wilson has not renewed on appeal the claims he made below

---

[28]     510 F.3d at 1178 (emphasis in original) (quoting *Kastigar v. U.S.*, 406 U.S. 441, 458-59 (1972)).

[29]     *See id*. at 1175.

[30]     *See State v. Gonzalez*, 853 P.2d 526, 532 (Alaska 1993) (holding use and derivative-use immunity insufficient under Alaska Constitution to compel testimony at criminal trial, instead requiring transactional immunity which protects witness from any prosecution for testified-to offense).  *But see C.D. v. State*, 458 P.3d 81, 88 (Alaska (continued...)

that his dismissal was without "just cause" or "opportunity to be heard." Nor has he revived his related contractual claims.[31] We need not decide these issues, as the parties have not briefed them.[32]

On appeal Wilson argues only that the State violated his right against self-incrimination by terminating him for refusing to answer questions *without notifying his attorney* that his answers would not be used against him criminally. The State verbally notified Wilson himself, but he asserts these notifications were inadequate. Wilson argues that, at least when an employee has retained counsel, the State should be required to provide these notifications in a manner enabling consultation with counsel: in the presence of counsel, directly to counsel, or in advance and in writing to the employee.

For support, Wilson points to our holding in *McCracken v. Corey* that a parolee facing both revocation and a criminal trial for the same conduct "must be advised

---

[30] (...continued)
2020) (exercising our "inherent supervisory powers" to mandate use and derivative-use immunity for "a minor's juvenile waiver hearing testimony"); *McCracken v. Corey*, 612 P.2d 990, 997-98 (Alaska 1980) (exercising our "inherent supervisory powers" to mandate use and derivative-use immunity for a parolee at a revocation hearing facing a later criminal trial for the same conduct and describing that immunity as "adequate[] [to] protect the parolee . . . from infringement of his constitutional rights").

[31] The closest Wilson comes to addressing his non-constitutional claims is by challenging the superior court's ruling that he "was not entitled to a remedy" even if a violation of his privilege against self-incrimination was found, because the superior court believed "Wilson would have been terminated whether or not he answered the questions." Since we find no violation of his privilege against self-incrimination, we need not address whether Wilson would have been dismissed regardless of his refusal to answer. Wilson also has not argued on appeal that the State violated the collective bargaining agreement between Wilson's union and DOC because the allegations of his conduct did not rise to "substance abuse" or "[g]ross disobedience" as defined in the DOC Standards of Conduct or the bargaining agreement.

[32] *See Casciola v. F.S. Air Serv., Inc.*, 120 P.3d 1059, 1062 (Alaska 2005).

prior to revocation proceedings" that testimony at revocation and any fruits thereof may not be used against him "at a subsequent trial on the underlying offense."[33] But we based that holding on "our inherent supervisory powers over the administration of justice by courts of this state," which do not apply here.[34] Additionally, here the State did advise Wilson — prior to his refusal to answer — that his compelled answers could not be used against him criminally.

In *Graham v. State* we considered whether a police officer must affirmatively explain to a person arrested on suspicion of drunk driving that the right to remain silent does not protect a refusal to take a breath test.[35] We held that police must explain this "if it appears that the refusal is based on a confusion about [the arrested] person's rights."[36] However, we placed on "[t]he defendant motorist . . . the burden of showing that he or she was in fact confused."[37]

Before compelling Wilson to answer questions, the State explicitly advised him on two occasions that his answers could not be used against him criminally and that refusal to answer would be grounds for termination. Both times, Wilson affirmed he understood this advisement before refusing to answer. Thus the State has submitted evidence showing Wilson had notice of and understood the content and consequences of his *Garrity* immunity, and Wilson has submitted no evidence suggesting he was

---

[33]     612 P.2d at 998-99.

[34]     *Id*. at 995, 998.

[35]     633 P.2d 211, 214 (Alaska 1981).

[36]     *Id*. at 214-15.

[37]     *Id*.

confused. Therefore, Wilson failed to show any genuine dispute of fact on the issue of whether or not he understood his rights.

Wilson asks us to require more of state employers — either notice to counsel or notice in advance — than any circuit has yet required.[38] Providing notice of *Garrity* immunity alongside the advance written notice of a compelled interview would avoid confusion by public employees and forestall any possibility of a successful challenge to a *Garrity* notification's effectiveness.[39] But because the State advised Wilson of his *Garrity* immunity and the consequences of refusing to answer, and Wilson affirmed he understood those advisements and has made no claim of confusion, the State did not violate Wilson's privilege against self-incrimination.

## V. CONCLUSION

We AFFIRM the superior court's grant of summary judgment.

---

[38] *See Atwell v. Lisle Park Dist.*, 286 F.3d 987, 991 (7th Cir. 2002) ("Whatever the merits of the [*Garrity* advisement] rule, and whether, in light of its rationale, it has any possible application when the employee has a lawyer, we have already registered our agreement with the Fifth Circuit that there can be no duty to warn until the employee is asked specific questions.").

[39] DOC's human resources interviewer admitted "it would have been better" had the written interview notices included *Garrity* advisements; he explained the potential "oversight" by noting that DOC "had not compelled testimony before" and so was in "uncharted waters."